# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 24, 2002 Session

## STATE OF TENNESSEE v. BYRON LOOPER

**Direct Appeal from the Criminal Court for Cumberland County**
**No. 5346     J. Steven Daniel, Judge**

---

### No. E2001-01550-CCA-R3-CD
### February 3, 2003

---

The defendant, Byron Looper, was convicted of first degree murder and sentenced to life imprisonment without the possibility of parole. He timely appealed, presenting as issues: (1) the trial court erred in excluding the testimony of witnesses who would have testified as to his location following the homicide, violating his right to due process; (2) the trial court erred in keeping under seal the psychological records of one of the State's witnesses; and (3) the evidence did not support application of the aggravating factor that the homicide was committed because the victim was a state official. Following our review, we affirm the conviction and the imposition of life without the possibility of parole.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

John E. Herbison, Nashville, Tennessee (on appeal); McCracken Poston, Chattanooga, Tennessee (at trial); and Ron Cordova, Newport Beach, California (at trial), for the appellant, Byron Looper.

Paul G. Summers, Attorney General and Reporter; Mark E. Davidson, Assistant Attorney General; William E. Gibson, District Attorney General; and David A. Patterson and Anthony J. Craighead, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

To the extent possible, we will review the evidence in an order which is chronological to the offense.

### STATE'S PROOF

The victim, Tommy Burks, had lived in Cumberland County with his wife Charlotte for approximately thirty years. He first had been a state representative and then a state senator, being

in the latter position for approximately twenty years prior to his death on October 19, 1998. The defendant, Byron Looper, was the Putnam County Tax Assessor at the time.

Sergeant Joseph H. Bond, a Marine recruiter residing in Hot Springs, Arkansas, testified that he had known the defendant since they were about 14 years old and in the ninth grade. They did not see each other "for quite a while" after high school, Bond joining the Marines and the defendant entering the United States Military Academy. He next saw the defendant around Christmas of 1985, two years after they had graduated from high school, and, following that, in 1986, when the defendant enrolled at the University of Georgia. He did not see the defendant again until approximately ten years later. The defendant called him in May or June 1998 and said that he wanted to stay in touch with Bond, and, about three weeks later, again telephoned Bond, asking if he could visit him in Arkansas. Bond agreed, and the defendant came to Hot Springs shortly after that, visiting in June 1998. Together they went to a bar and drank throughout the night. During this evening, the defendant said that he was "either a senator or a congressman," in Tennessee and, accordingly, Bond introduced him as "Senator Looper." Either later that night or the next morning, the defendant admitted to Bond that he was "actually just running for office."

During this weekend visit to Hot Springs, the defendant spoke of his interest in firearms, saying that he had "been thinking about getting one." He questioned Bond about the specifics of firearms, "different calibers, how accurate they were, the ranges on them, and asked . . . about silencers," as well as "[c]oncealibility, what would be concealable in a crowd." Later during the visit, speaking of the election, the defendant said that "he had thought about killing [his opponent]." Additionally, he said that "if there were only two people on the ballot, if one of them died 30 days before the election, that he would automatically win."

The defendant then came unannounced to Bond's apartment in July or August 1998, where he stayed for "a couple of days." During this visit, the defendant "was more intent on getting a weapon," saying that "since the election was coming up, he needed one quick." Although he had no intention of doing so, Bond agreed to obtain a pistol for the defendant. Bond said he thought "the election would go ahead and happen, and that would be it, and I wouldn't hear anything else about it." After his departure, the defendant telephoned Bond "about every day, sometimes two, three, four times a day," wanting "to know if [Bond] had got him a pistol yet." Bond made excuses for not doing so, and did not obtain a pistol for the defendant. The defendant sent Bond a money order for $150. The telephone calls from the defendant continued "[i]nside of a week of him leaving."

William Lindsay Adams, Jr., testified that he resided in Baton Rouge, Louisiana, and periodically worked "as a staff person for political campaigns around the country and in [his] own state." He would become affiliated with candidates by word of mouth or through trade publications. In the July 1998 edition of Campaigns and Elections, he had seen a notice seeking "a campaign staff or manager for a first tier campaign." The advertisement provided a facsimile number to which to respond but not the name or other information about the candidate. About three days after he had faxed his résumé to the number, Adams received a telephone call from a person identifying himself as "Byron Looper," who said that he "had changed his name to Low Tax Looper." Adams told of

his "credentials," which included working "for a conservative governor who had just recently passed some laws in Louisiana that [the caller] seemed interested in." The caller asked about "[c]oncealed weapons laws" and the "details of the law, and how it was passed, and what was [Adams'] role in the legislation, or the campaign to get this law elected." The caller said that he was a candidate for the state senate; and, Adams "wanted to know how much he thought it would take to run a race" to find out "if he was serious or not." The caller said that the race would cost "[t]hirty-five cents," but Adams did not ask for an explanation because the conversation was "very awkward" with "[a] lot of pauses." Adams testified how the caller said that he would win the race: "He had several ideas, but he suggested that maybe if a candidate wasn't in the race at the end, if something happened to the candidate, that the race wouldn't cost that much to run, which was my concern, the money." Adams decided against going to work for the caller.

Russell Duke testified that he had been a friend of Russell Looper, the defendant's brother, for "[a]t least five, six, seven, eight years." Duke said that he resided in Oakwood, Georgia, which was located in the northeast part of the state, "[a]bout [a] four-and-a-half, five hours" drive from Crossville, Tennessee. He testified that he and Russell Looper had planned to go out with some friends on October 17, 1998; but, because Looper "had something that he had to do" with his girlfriend in Atlanta, Duke then agreed to "run some errands for Byron," at Looper's request. Prior to that, he had met the defendant on two occasions. Duke and the defendant were to meet at the Flowery Branch, Georgia, home of the defendant's mother, which was "[w]ithin five to seven miles" of Duke's residence. Duke arrived there at about 7:30 p.m. and allowed the defendant to use his cell phone to make two or three calls about car advertisements he had seen in an Auto Trader magazine. The defendant owned a Beretta automobile which he left at his mother's residence as Duke drove him to look at cars for sale. With the defendant driving, they took one of the cars for sale, a black, four-door "older body-styled Audi," on a test drive. The defendant purchased the Audi for "somewhere like twelve ($1200) or twelve, fifty ($1250)." In his own vehicle, Duke followed the defendant, driving the Audi, back toward the home of the defendant's mother. Five or ten miles before his mother's house, the defendant and Duke stopped at a car wash, where the defendant said that "he wanted to find somewhere that was well lit to leave the car." It was then parked at a shopping mall about ten miles from the house of the defendant's mother, with Duke returning the defendant to her residence. The defendant explained that he wanted to park the car at a place other than his mother's house "because cars had been following [him] since he had came [sic] from here down to his mother's." Duke had not spoken with the defendant since that night. However, he later identified to Tennessee Bureau of Investigation ("TBI") agents the seller of the Audi.

On cross-examination, Duke said that it had taken "[a]pproximately four-and-a-half to five hours" to drive from his home in Georgia to Crossville, where the trial was being conducted. He agreed that to drive from his residence in Georgia to Crossville by the expressway, it would be necessary to go south to Atlanta. To avoid this, a driver would have to take "[c]ountry back roads." Regardless of which route was taken, the drive from his residence to Chattanooga would take "probably two and a half hours." Duke said that the tires on the Audi, when it was purchased by the defendant, were "pretty worn."

Michael R. Levy testified that in October 1998, he had been living in Lilburn, Georgia, and had advertised a 1987 Audi 4000-S in the Auto Trader for sale. He said that the defendant responded to the advertisement on October 17, arriving with a friend at Levy's residence about 6:00 p.m. The defendant told Levy that he bought cars, repaired them, and then sold them. Levy received $1200 in cash from the defendant for the vehicle, giving him the title and a bill of sale. Identifying his receipt for a tire purchase, Levy said that he had fourteen-inch NTW Viper tires put on the vehicle on October 19, 1996, and had driven the car 30,000 miles since installing the tires, which "were in good condition, though." He said that the car had ignition problems and would not start all of the time.

On the morning of Monday, October 19, 1998, the victim and his wife slept later than usual; and the victim did not go to a local Hardee's restaurant for biscuits for himself and his grandson, as was his custom. A group of children were coming to the pumpkin patch on their farm between 9:00 and 9:30 a.m. that morning. As the victim was preparing to leave for the pumpkin patch, his daughter telephoned, and, after they talked, his wife spoke with their daughter, who was celebrating her birthday that day. The victim left for the pumpkin patch, and his wife left to join him at about 8:30 a.m.

As the victim's wife was on her way to meet her husband, she saw their farm hand, Wesley Rex, as he drove "real fast" out of the farm road. She jumped out of her car to meet him as he pulled over. He jumped out of his truck and said, "Something's bad wrong with [the victim]. He's got blood coming out of his ear." She instructed him to telephone 9-1-1 and then proceeded down the farm road to her husband. She saw his truck and got out and touched him. She explained that, "I didn't really realize what – I didn't know what had happened to him until I – I was holding him, and I felt the back of his head, and he had a big knot on the back of his head, and I looked at his face, and I could see the hole."

The victim's daughter, Kim, and emergency medical workers soon arrived at the scene. Detective Gary Roach, of the Putnam County Sheriff's Department, followed by Chief Detective David Andrews, arrived at about 9:00 a.m. A number of other law enforcement officers subsequently arrived. Roach went to the victim's truck, seeing that the driver's side door was open and that the victim's body was inside. Wesley Rex said he had seen a black car coming down the farm road, away from the victim's truck, before Rex had found the victim's body. After Rex had shown Roach the place where the black car had turned around, officers secured the area and covered the tire tracks with tarpaulins to preserve the evidence. Photographs and a videotape were made of the crime scene. The following morning, Detective Roach was informed that someone at the victim's farm wanted to speak with him, and, upon his arrival, learned that it was Wesley Rex. He met Rex at the hog barn where Rex said that he had seen on television the person who had been driving the black car, and that his name was Byron Looper.

Wesley Rex testified that he was 24 years old and had lived on the Burks' farm since he was three. He had graduated from high school in Cookeville, where he had attended special education classes and received a special education diploma. He said that he had trouble in school with "my

reading, writing, and my math." He had no trouble with his vision. He described his duties at the farm as "tak[ing] care of the animals, and feeding the cows, and just different stuff." On the morning of October 19, 1998, he had gone to the Hardee's restaurant in Monterey for breakfast, and then returned to the barn to feed the animals and prepare for a group of children coming that day for a hayride to the pumpkin patch. As he was on the farm road, he "saw a black car come in, so [he] pulled over, and [he] seen [the victim] coming in behind it." He described the single occupant of the black automobile as "a white male, had glasses on, had a black jacket on with a pair of gloves on." The vehicle proceeded down the road and then turned around. The victim stopped his truck beside Rex and asked "who was in the black car." Rex replied that he did not know who the occupant was. As Rex drove off, he looked back and saw the black car pull alongside the victim's gray Dodge pickup truck. Rex continued and when he had gone about 100 yards, going to the hay trailer, he heard a "pop," and thought he had run over gravel or had a blowout. As he looked in the mirror, he saw "the black car coming in behind" him "pretty fast." The black car turned on Highway 70 toward Monterey. Not realizing that anything was wrong, Rex fixed the hay wagon before returning to the barn. About five minutes later, he passed the victim's truck, and it appeared that the victim "was reading something in his lap." Returning on the tractor, Rex again came beside the victim's truck:

> And, so, I went on through and got the tractor. I come back out the same road on the tractor, and I got up there to [the victim's] truck, and I seen that there was some blood on his ear, and I thought there was something wrong, so I got off the tractor and checked him. I sort of touched him, and I noticed – I said, "Well, I need to go tell Kim."

He then went to the victim's daughter's house located at the end of the road and told her to call 9-1-1. Next, he found the victim's wife and told her that "there was something wrong with [the victim]," and asked an acquaintance who worked at the fire department come to the scene.

Rex testified that, before that day, he had never seen the defendant. He later told the police that the black car "looked like a Toyota," but he was not certain that this was the case. Looking at a photograph of a black Audi automobile, he said that it appeared to be of "the car that was on the farm that morning," recognizing it partly because of "the circles on it . . . the seat covers, the top of the seats." Later that morning, Rex assisted a police officer in preparing a computer sketch of the man he had seen driving the black car. The following morning, he went to the residence of Moe, a fellow farm worker, to see if he was going to work that day and sat with him to watch the news. As he watched a morning newscast, he was "[a] hundred percent" certain that a photograph of the defendant being shown was the man he had seen driving the black car on the farm road the morning of the killing. Rex then went to Mrs. Burks' house and told the two deputies there that he "needed to get a hold of Gary Roach," who was the only investigator he remembered from the previous day. He told Roach that he had recognized the man, although he could not remember the man's name. Rex then identified in court the defendant as being the man driving the black car he had seen that morning on the farm road.

At the crime scene, TBI Agent Don Carman observed the victim's body and took inventory of the contents of the victim's pockets. Inside the victim's pockets were $43, a white handkerchief, a brown wallet containing a driver's license, a pocketknife, two sets of keys, and some change. Carman inspected the victim's truck but did not find any fired bullets or cartridge cases. The driver's side window of the victim's truck had been rolled down and was not broken.

Agent Carman, who was qualified as a firearms identification expert at trial, testified that he examined the bullet recovered from the victim's body and determined it to be a nine-millimeter class jacketed bullet. Carman also received a Smith and Wesson Sigma Series Model SW9V nine-millimeter pistol, as well as a Smith and Wesson nine-millimeter magazine, for examination. After examining test-fired bullets from the pistol and comparing them with the bullet recovered from the victim, he determined that the bullet was fired from the barrel of the pistol. He testified that the magazine was restricted for law enforcement use and was banned for normal practice.

Dr. Sullivan Smith, an emergency physician at the Cookeville Regional Medical Center and the Putnam County Medical Examiner, testified that he arrived at the crime scene at approximately 9:30 a.m. The victim's body was still in his truck, and Dr. Smith observed that he had a bleeding wound from his face. Later, he signed the death certificate, which listed the cause of death as a gunshot wound to the head.

Dr. Charles Harlan testified that he performed the autopsy on the victim's body on October 19, 1998. The cause of the victim's death was a gunshot wound to the head. Dr. Harlan stated that the bullet entered the victim's body "at the junction of the left side of the bridge of the nose and the left eyebrow . . . and then traveled through the brain and was recovered in the posterior right calvarium." The victim's wound was a "distant gunshot wound," meaning that the barrel of the weapon was at least twenty-four inches from the victim's body when it was fired.

The morning that the victim was killed, Jenny Conley, the manager at the Hardee's restaurant in Monterey, was working at the drive-through window where her first customer that morning "seemed like he was in a hurry and nervous, upset that he had to wait for the correct food." As she corrected his order, he "slapped the money on the counter," from where the wind blew it into the store. She described the customer, who was wearing a white Oxford shirt and black, wire-rimmed glasses, as "[k]ind of slender, average height . . . [d]ark hair that's kind of feathered on the side." The customer was driving a black, four-door car with gray interior. Ms. Conley later identified the defendant from a photographic lineup as this customer.

The defendant appeared, again unannounced, at Sergeant Bond's apartment between 11 p.m. and 1 a.m. the night of October 19, 1998. After being admitted into the apartment, the defendant's first words were, "I did it, man, I did it." When questioned by Bond, the defendant said, "I killed that dude. . . . That guy I was running against. . . . I busted a cap in that dude's head." The defendant was "[n]ervous, fidgety, pacing all over [Bond's] livingroom [sic], pacing behind the couch, couldn't be still." The defendant said that he had used a nine-millimeter pistol he had gotten from "a guy he knew that either had a business or went to police auctions, went to gun shows, things

like that." He said that, after he shot the victim, "he drove for about 10 or 15 minutes and threw [the pistol] out the window." Disclosing the details of the killing, the defendant said that it had been "kind of foggy" that morning and he had gone to the victim's house and shot him. Concerned that he had left tire tracks at the scene, he asked if Bond "knew a place where he could get . . . new tires." He said that, at the shooting, "he passed a guy on the road that either knew him or might have known him, and – but he didn't know whether he saw him or not, or could tell who he was." The defendant questioned Bond, "You'll cover my ass on this, won't you?" Bond replied that he would provide an alibi for the defendant, who then said, "If you walked in in your dress blues with all of those medals you've got, that would be the best alibi I could ever have."

The defendant left Bond's apartment the following morning, exchanging suitcases with Bond because "he didn't want anything on his suitcase." As the defendant went to leave, his "car wouldn't crank," so Bond pushed the defendant's car with his own. Bond identified a photograph of an Audi 4000-S as being the vehicle the defendant was driving. The defendant left Bond's apartment on Tuesday, and Bond's brother telephoned the following Friday or Saturday to inform him that the defendant's opponent had been killed. Concerned about what might happen to him, and after advice from others in this regard, Bond telephoned the district attorney's office where the killing had occurred.

Gerhard Noll testified that he owned and operated an auto repair shop in Tucker, Georgia. He said that "[s]omewhere between the 11th to 20th" of October 1998, a man brought a black, four-door Audi 4000-S to his shop, complaining of several problems with the vehicle. The repair order for this vehicle, which had been partially filled out by the customer, bore the name and signature of "Anthony Looper" and the address "Creek Stone Court" in Stone Mountain, Georgia. The charge for the repairs was $575. The repairs did not include replacing the tires. The customer, whom Noll said he could no longer identify, told him that he was going to be out of town and leave the car for "a couple of weeks." However, the vehicle remained there for several months. After receiving a telephone call notifying him that the person who had left the car no longer wanted it, Noll utilized the vehicle's paperwork, which he found in the glove compartment, and sold it. The title named "Michael Levy" as the seller and "Joann Milligan," to whom Noll sold the vehicle, as the buyer. Milligan testified that she had purchased the vehicle from Noll for $1,700. Because the tags on the car had not expired, she did not change them, and, subsequently, was met by police officers as she was about to get into the vehicle. She had not replaced the tires after purchasing it from Noll.

Robert J. Muehlberger, the manager of the forensic laboratory of the United States Postal Inspection Service and a forensic document examiner, testified that he had examined the signature "Anthony Looper" on the original Gerhard Auto House form and on a quitclaim deed and two campaign financial disclosure statements bearing the signature "Byron A. Looper," as well as an appointment of political treasurer form also bearing the signature "Byron A. Looper." He testified that, in his opinion, the same person had signed each of these documents.

Nancy Bowman, the administrator of elections for Putnam County, testified that the candidates for the 1998 election for the Fifteenth Senatorial District were Tommy Burks, the

Democratic nominee, and Byron Looper, the Republican nominee. Because Senator Burks died fifteen days prior to the election, his name was covered over on the voting machines and marked out on the paper ballots, in accord with Bowman's interpretation of the election law. She said that the defendant had signed his qualifying petition as "Byron Low Tax Looper." Since Senator Burks died less than forty days prior to the election, only the defendant's name appeared on the ballot. However, Charlotte Burks, the victim's widow, won the election, as a write-in candidate, in each of the eight counties in the district.

TBI Agent Larry O'Rear testified that he participated in the execution of a search warrant at the residence of the defendant. He identified a shoulder holster which was found hanging on a coat rack in one of the bedrooms; however, no pistol or other type of firearm was found in the residence. He did not have an opinion as to whether the holster was designed for a particular type of pistol, revolver, or semiautomatic. During his testimony, he placed, alternately, in the holster, a .45 automatic and a nine-millimeter Smith and Wesson.

Jimmy Hamlet testified that in March 1999, while employed by Meadows Construction, he was working with a crew "picking up litter along the interstate and the exits." On March 1, they had started at Monterey on I-40 West and were working toward Cookeville. He testified that while "walking up the exit ramp" at Exit 288, he found a nine-millimeter Smith and Wesson pistol. Hamlet subsequently gave the pistol to Randy Maynard of the Tennessee Highway Patrol.

James Sparkman, an employee of Averitt Express, testified that the weekend following Thanksgiving 1998, he was "four-wheeling" near his grandparents' property by the Calfkiller River and came "across something shiny in the road." He said that the object, which was a gun magazine, "had mud on it" and was on the river bank between two bridges. Later, his mother telephoned the White County Sheriff's Department, informing them of the clip, and was told it would be picked up. However, this did not occur and Sparkman then telephoned the Cumberland County Sheriff's Department because of his concern in having the clip upon which was imprinted "law enforcement use only." Subsequently, he gave the clip to a TBI agent. He said that he found the clip "approximately 20 to 25 miles" south of the intersection of Highway 111 and I-40.

John Kenneth Stansell, Jr., the general manager for G.T. Distributors in Rossville, Georgia, testified that his company, located ninety-six miles from Crossville, Tennessee, sold law enforcement equipment. He said that on March 7, 1997, he sold two Smith and Wesson SW9V nine-millimeter pistols, bearing serial numbers PAM8264 and PAM7629, to Officer Tim Murphy of the Monterey Police Department, after Murphy had presented him with a letter from the City of Monterey authorizing Murphy to make the purchase.

Officer Tim Murphy of the Monterey Police Department testified that on March 7, 1997, he met with John Bowden, Mayor of Monterey, at City Hall where Bowden gave him $700 in cash to purchase two Smith and Wesson Sigma nine-millimeter pistols for him. That day, Murphy and Officer Bruce Cantrell drove to G.T. Distributors in Rossville, Georgia, where Murphy purchased the pistols Bowden had requested, as well as two .40 caliber pistols, while Cantrell purchased a .45

caliber pistol. Upon their return to Monterey, Murphy delivered Bowden's pistols to him at his office, where the pistols were passed around and "dry-fir[ed]" by Bowden, Murphy, City Council Member Walt Phillips, and Assistant Chief of Police Terry Rizor. When Murphy left Bowden's office that day, both nine-millimeter pistols were in Bowden's possession. However, he later learned that Walt Phillips was the recipient of one of the pistols and assumed that Bowden had kept the other one.

Subsequently, in March 1999, after the murder weapon had been found and associated with the victim's death, Murphy was twice interviewed by TBI Agent Bob Krofssik about his purchase of the nine-millimeter pistols. Murphy admitted that he lied about "[a] lot of things" in the first interview, specifically that he originally bought the pistols for himself, not disclosing that he had in fact purchased them for Bowden. He said that he lied during the interviews because of fear that he had used his position as a police officer "for something other than it was meant to be." Murphy admitted that he had untruthfully completed the Federal Firearms Transaction Form on March 7, 1997, by answering "yes" to the question: "I am the actual buyer of the firearm indicated below. I understand that if I answer no to this question, the dealer cannot transfer the firearm to me."

Sheila Johnson, a secretary in the Putnam County Tax Assessor's office who also had done housecleaning for the defendant at his residence, testified that the defendant did not come to the office during October 19-22, 1998. She said that John Bowden also worked in the assessor's office and was there on October 19, 1998. She noticed that the defendant "seem[ed] a little more quiet" than usual during the three weeks preceding the victim's death.

While cleaning the defendant's residence about a month to a month and a half before the victim's murder, Ms. Johnson saw a handgun under a cushion on the couch. She was contacted by law enforcement officials on October 21, 1998, and gave a statement to TBI Agent David Emerin about the handgun which she said had a "two-tone to it . . . darker on the bottom and lighter on top." After she was shown an array of gun illustrations in an effort to identify the type of handgun she had seen, Ms. Johnson initialed the illustration of a Model SW9V pistol. However, she felt she had been "[s]omewhat" directed to certain types of guns to identify.

On cross-examination, Ms. Johnson testified that she "felt intimidated . . . like I was the one being tried for this" when she gave her statement. She was not allowed to write her statement, and, to her knowledge, her statement was neither tape-recorded nor videotaped. She said that she told the assistant district attorney before trial that the gun illustration she had initialed was not the gun she had seen at the defendant's house.

TBI Agent David Emerin testified that the victim's farm employee, Wesley Rex, came to the Putnam County Justice Center on October 20, 1998, and said that he had seen the man he saw the morning the victim was killed on television in a political advertisement. The defendant became a suspect and, the next day, October 21, 1998, the TBI called the Putnam County Tax Assessor's Office and asked employees to come to the justice center three at a time for interviews. During Emerin's interview with Sheila Johnson, she told him that once when she was cleaning the

defendant's house, she saw the handle area of a gun which was "a gray on the upper top area, and . . . darker on the bottom lower area." He showed Johnson two gun catalogs which she reviewed thoroughly, immediately discounting the revolvers and any type of rifle or shotgun as the gun she had seen at the defendant's house. After Johnson was unable to identify any weapon in the catalogs, Emerin contacted Tommy Hefland, a senior forensic scientist with the TBI Laboratory, Identification Division for Firearms, and gave him Johnson's description of the gun: "different colored material on it, the ridges on the slide were from the center of it, all the way back." Hefland told him that the description sounded like "something from the Sigma series" and faxed him a photocopy which he showed to Johnson. Johnson identified the gun on the photocopy as the type she had seen at the defendant's house. At the time of Johnson's interview, Emerin did not know what the murder weapon looked like; he only knew that it was a nine-millimeter because that was the type of bullet recovered from the victim. He reduced Johnson's statement to writing, and the two of them went over the statement "line by line, period to period," with Johnson initialing all corrections and the top and bottom of each page for authentication purposes and also signing an affidavit.

Agent Emerin was contacted by Joe Bond who expressed a desire to come forward with the information he had. Subsequently, on November 3, 1998, Agent Emerin met with Bond in Georgia where Bond gave him the defendant's bag which had a Delta Airlines identification tag bearing the defendant's name. Two days later, he met with Bond again, this time at Bond's apartment in Hot Springs, Arkansas. There, Bond gave him another bag, containing numerous items of clothing and personal items, that belonged to the defendant. Agent Emerin individually bagged the contents of the bag and took photographs of the bag, Bond's vehicle, and Bond. At that time, he also interviewed Candace Hill in the presence of her parents because she was a minor.

Georgia State Representative Michelle Henson testified that the defendant, a friend of hers and her ex-husband, came to her home on Creek Stone Court in Stone Mountain, Georgia, on October 21, 1998, after 10:00 p.m. The defendant was driving a dark-colored Audi automobile. The defendant told her that his opponent had been shot, but she did not ask him for details and he gave none. At her invitation because of the lateness of the hour, the defendant spent the night at her home. The defendant asked to use her telephone and said he wanted to use a secure phone as opposed to a cordless phone but did not say why. The following morning, October 22, 1998, she read a newspaper article about the victim's murder which stated that the authorities wanted to talk to the defendant. She spoke to her ex-husband and expressed concern about the defendant's being at her residence. She asked the defendant where he was the day of the murder, to which the defendant replied "down south." The defendant told her "[s]omething to [the] effect" that she did not "need to know anymore information." After the defendant spoke to her ex-husband on the telephone, she loaned the defendant some money which was later reimbursed by her ex-husband. She described the defendant's demeanor when he was at her home as "nervous . . . not being calm and just sitting there calmly[.]"

Douglas Henson testified that he was formerly married to Representative Michelle Henson. He said he had been acquainted with the defendant, whom he described as somewhat "quirky" and known to exaggerate situations at times, for over ten years. On October 22, 1998, Representative

Henson telephoned him while he was reading a newspaper article about the victim's murder. He also spoke to the defendant who was at Representative Henson's home. The defendant asked him if he could borrow $200 to $300, which Representative Henson gave to the defendant, Henson later reimbursing her. Henson asked the defendant if he was in town at the time of the murder, and the defendant said he was not. When Henson asked the defendant where he was, the defendant said "[s]outh." Henson asked, "South where?" and the defendant said, "[T]hat's facts, and we're not going to talk about the facts."

Randall Kirk Nelson, an employee of the TBI Crime Laboratory assigned to the trace evidence section, identified a series of photographs which he had taken and castings he had made of the tire tracks at the scene. Two of the tracks he identified as having been made by a farm tractor located near the victim's truck and a pickup truck driven by Wesley Rex. He said that he found an unidentified track on the road near the victim's vehicle and at a nearby turnaround area. Castings were made of the unidentified tracks, and he turned over these, as well as the photographs of the tire tracks, to Sandy Evans, the tire track examiner at the TBI Laboratory. He said that he had not taken any measurements to determine the stance or wheel base of the vehicle which had left the tracks because the tracks did not provide him with the information he needed to make those measurements. He defined "stance" as "a measurement of the center of a passenger side tire to the center of a driver's side tire, the front, and also in the back" and "wheel base" as "a measurement of the center of the back tire to the center of the front tire."

TBI Special Agent Sandra Evans, assigned to the microanalysis section of the crime laboratory, testified that she compared the tire track photographs and castings with those in The Tread Design Guide and utilized Tread-Assist Software to try to identify the type of tire which left the tracks. Her conclusion was that the tracks were consistent with a 1997 National Tire and Warehouse "Viper-TR Passenger Tire," a 1998 National Tire and Battery "Viper Radial-T Passenger Tire," and a 1998 Sears "Viper-T Passenger Tire," which are manufactured by the Cooper Tire and Rubber Company. Upon cross-examination, Evans testified that she had examined the defendant's Audi automobile on July 1, 1999, and, based upon that examination, concluded that the tires then on the Audi had not left the impressions at the crime scene. She said that she had examined the Beretta automobile on November 4, 1998, and that the tires from the Beretta, likewise, were inconsistent with the tire tracks at the crime scene. After Cooper Viper-TR tires were mounted on the Audi, it produced a "track similar to" that left at the scene of the homicide.

Bruce Currie testified that he was manager of technical standards for the Cooper Tire Company and was accepted as an "expert in his field as a tire engineer." Based upon his examination of the tire castings from the crime scene, he determined that "the measurements from the three tire castings [were] consistent with the dimensions of a P19560R14 Viper-TR Radial GT tire manufactured by Cooper Tire & Rubber Company." He said that between the introduction of this tire in 1996 and the time of the homicide, approximately 15,000 of these tires were manufactured out of the 105,000,000 tires his company manufactured during that period.

Dorothy Henry testified that she had been employed in the Putnam County Tax Assessor's Office from approximately two weeks after the defendant began his term as tax assessor in 1996 and worked there until his successor had taken office after the defendant's arrest. The defendant did not come to the office much, "maybe once or twice a week a couple of hours, or something like that," and employee turnover was high. John Bowden came to work in the assessor's office in 1998 and was a friend of the defendant. She said that, although Bowden was supposed to perform field work, "he didn't know anything about field work." She knew no function that he performed. On the day that the victim was killed, Bowden was in the office, but the defendant was not. Another former employee of the Putnam County Tax Assessor's Office, Robert Michael Nail, said that the defendant had hired him in 1997, and he had worked there for fifty weeks. He said that John Bowden "handed out work assignments" and "was about first in command." Bowden "might work . . . about ten hours out of the week, but most of the time, he sat there and was on the computer playing solitary [sic]." Bowden was paid $19,000 per year. On cross-examination, Nail said that he had filed a $1.2 million wrongful termination lawsuit against the defendant after he was terminated. Because of Nail's duties in "the field," he was in the office "maybe an hour a day."

## DEFENSE PROOF

Virginia Hill, the mother-in-law of State's witness Joe Bond, testified that she was present in November 1998 when TBI Agent David Emerin interviewed her daughter, Candace Hill Bond, who was a minor at the time. Her daughter told Emerin that she had been molested that summer by the defendant at Bond's apartment. Virginia Hill asked Emerin to omit this information from his report because her "daughter was already traumatized," and Hill "did not want it drug through the courts, and for the defense to make [her daughter] look bad." The next day, she asked Bond if he knew about the incident. He replied that the day his wife told him that the defendant made her "feel uncomfortable," he had asked the defendant to leave. When told of the matter, Virginia Hill's husband became more angry than had Bond, and, further, had become angry at Bond for not doing more about the incident.

Elizabeth Howard, an emergency medical technician with the Putnam County Ambulance Service, testified that she had been called to the crime scene the morning of October 19, 1998, and saw a man, whom she later learned was Wesley Rex, talking with a police officer. Rex told the officer that the black vehicle at the scene "could have been possibly a Toyota" and that Rex did not know who had been driving.

The former mayor of Monterey, Tennessee, John Henry Bowden, testified that the defendant had hired him to work for the Putnam County Tax Assessor's office. He said that his initial statement was untruthful that he had purchased a Smith and Wesson nine-millimeter pistol from a flea market. In fact, he had obtained two Smith and Wesson Sigma nine-millimeter pistols in March 1997, while mayor, through a purchase he had authorized for the Monterey Police Department. He kept one pistol for himself and gave the other one to Walter Phillips. After keeping the pistol for "around two or three months," he sold it at a Crossville flea market to a man, whom he did not know, of "medium build." However, during cross-examination, Bowden acknowledged that he had been

in possession of the pistol when he was arrested in December 1997, and that he had owned the weapon until "[s]ometime after the first of the year" of 1998.

Bruce Cantrell testified that, as a Monterey police officer in March 1997, he had gone with Officer Tim Murphy to G.T. Distributors in northwest Georgia to purchase handguns. He purchased a Colt .45 but did not know what weapons Murphy had bought or what he did with them.

Bruce Buckner, who lived approximately two miles from the victim's farm, testified that he had purchased in May 1998, a nine-millimeter pistol from Walter Phillips. Buckner said that his pistol was "on the end table by the bed at [his] home" the day that the victim was killed. Sometime after that, his pistol was stolen from his truck.

Angela Clark Harris said that she had been working at the Hardee's restaurant in Monterey on the morning of the shooting and had talked with Jenny Conley about the behavior of a customer at the drive-through window.

Walter Phillips, the vice-mayor of Monterey when John Bowden was the mayor, testified that in March 1997 he purchased a Sigma nine-millimeter pistol through Bowden's arrangement with Officer Tim Murphy. He said that he had sold the pistol, which came with a plastic carrying case, to Bruce Buckner about two months after he had purchased it but kept the case. The serial number on the case, PAM8264, was the same serial number on the murder weapon.

During cross-examination, Phillips said that when the pistols were delivered by Officer Murphy, he was one of the five people at Monterey City Hall who were passing the guns around, and there was a "very good chance" that he did not leave with the case the pistol had come in. He did not later compare the serial number of the pistol he had with that on the case and did not record the serial number of the pistol when he sold it to Buckner.

Reba Looper, the defendant's mother, testified that the defendant arrived at her home in Flowery Branch, Georgia, on Wednesday, October 14, 1998, and that she had last seen him there "[p]robably Sunday afternoon." After he had left, she discovered in her bathroom that "[t]owels were on the floor, the shower was in disarray, so I could immediately tell Byron had been there and taken a shower." This would have occurred during the day on October 19, 1998, while she was at work. Georgia Bureau of Identification Agent Loggins contacted Reba Looper to ascertain the whereabouts of her son. She said that she had not known where the defendant was at the time that Agent Loggins was looking for him or for two days thereafter.

John Dillon, who was qualified as an expert witness in firearms identification, testified that, in his opinion, the bullet recovered from the victim had been fired from the Smith and Wesson nine-millimeter pistol found at Interstate 40, Exit 288. He said that three bullets recovered from the backyard of the home of Walter Phillips had class characteristics consistent with the barrel of the same pistol used to kill the victim, but he could not say for certain that this was the case.

John Riley, an expert witness in gunshot residue analysis, testified that he reviewed TBI laboratory results of the gunshot residue examinations conducted on the 1989 Chevrolet Beretta. According to those examinations, gunshot residue was found on the interior and exterior of the Beretta.

Frank Sorrells, a resident of Bonnerdale, Arkansas, whose son had been recruited for the Marines by State's witness Joe Bond, testified, as to the reputation of Bond for truthfulness and veracity, that "[w]ith the people I knew, it wasn't very good."

Amy Orr testified that she had a relationship with Joe Bond, beginning in May 1997. Bond instructed her not to reveal their relationship to anyone, threatening her family if she did so. However, she said she did not actually feel threatened and did not take the threat seriously.

Tony Richards, the maintenance supervisor at the apartment complex where Joe Bond lived in 1998, testified that Bond had teenagers in and out of his apartment. He saw two rifles in Bond's apartment but no handguns. Bond once told him that he had some automatic weapons for sale.

Lieutenant Mark Webb of the Cookeville Police Department testified that, after learning on October 23, 1998, the defendant had returned to his house in Cookeville, he went to the residence and spoke with the defendant, who was calm but "a little bit nervous, too." The defendant did not allow Webb to enter his residence but agreed to remain visible through the windows.

Brilla Garrett, who had been hired by the defendant and had been the office manager of the Putnam County Property Assessor's office, said that she "hardly ever saw [the defendant] in the office." She said that she sent and received political faxes for his campaign against the victim. The defendant referred to the sheriff's department and the district attorney's office as the "good old boys' system." She said that she had told the defendant that he could not win the election against the victim, and he responded, "You think, you think."

Peter McDonald, testifying as an expert witness regarding treadprint identification, said that the tire tracks at the crime scene did not match the tires on the defendant's Audi. During cross-examination, he said that he had not considered that the tire prints at the crime scene were made by an automobile moving in reverse. He utilized "stance measurements," although TBI agents testified that such measurements could not be made from the tire tracks at the crime scene.

## PROOF AT THE SENTENCING PHASE

Two witnesses were presented by the State. Horace Burks, the brother of the victim, testified that the victim always had been the "leader" in the family, looked to for "advice" and "help." He said that his son, who was "really close" to the victim, had undergone counseling because of the victim's death. Kim Blaylock, the oldest of the victim's three daughters, said that, when she arrived at the crime scene, her mother was at the victim's truck, holding him. She said that the killing had occurred on the birthday of the victim's middle daughter. The victim's youngest daughter had

anxiety attacks as the result of her father's death. Her own daughter had trouble sleeping because of the death of her grandfather. She said that, in taking her father's life, the defendant "took my grandma and my mama. Because my grandma, it's just – it took everything out of her. My mama has lost 40 pounds."

Testifying on behalf of the defendant were his cousin, Carolyn Wilson, and his mother. Wilson said that after the defendant's parents had divorced when he was a teenager, his father had begun drinking, which troubled the defendant. She said the defendant had called her "many times," saying that "he was afraid for his life." He said, "They're all . . . out to get me, all the people in Cookeville." She believed the defendant was paranoid and in need of treatment.

The defendant's mother, Reba Looper, said that he had become distraught after she and his father were divorced. The defendant felt that "everybody was following him, and . . . hated him." She said that the defendant was "really nervous."

## ANALYSIS

### I. Exclusion of Defense Witnesses

During the defendant's presentation of proof, he attempted to call as witnesses his mother and brother, his mother's hairdresser, and one of his mother's neighbors to testify that he had been in Flowery Branch, Georgia, later during the morning of October 19, 1998, the day that the victim was killed in Cumberland County. After an objection from the State and extended arguments on the issue, the trial court allowed only the defendant's mother to testify as to his whereabouts following the crime. The exclusion of the other three witnesses was assigned as error, as explained by the defendant in his brief:

> The Defendant's principal complaint as to the guilt phase of the trial relates to the trial court's exclusion of the testimony of three witnesses who would have testified as to Mr. Looper's presence in Flowery Branch, Georgia[,] a few hours after [the victim] was fatally shot. This exclusion raises issues under Rule 12.1 of the Tennessee Rules of Criminal Procedure, and it further implicates the Defendant's due process right to offer the testimony of witnesses in his favor.

We will consider the defendant's claims after first reviewing the manner in which the exclusion issue developed in the trial court.

On February 17, 1999, four months after the crime, the State filed its demand that the defendant provide information as to his alibi, if this defense was to be asserted at trial:

-15-

> Comes now the State of Tennessee, by and through the District Attorney General for the Thirteenth Judicial District, William E. Gibson, and makes demand upon the defendant as follows:
>
> A. Notice of whether an alibi defense will be asserted.
>
> B. The specific place or places the defendant claims to have been at the time of the alleged offense.
>
> C. The names and addresses of the witnesses the defendant will use to support said alibi.
>
> Said offense being as stated in the indictment and occurring on October 19, 1998, between the hours of 6:00 a.m. and 8:45 a.m. Central Standard Time at the farm of [the victim] located next to I-40 near the point where the counties of Putnam and Cumberland join in Cumberland County, Tennessee.

Although the matter was not raised either at trial or on appeal, we take judicial notice of the fact that Daylight Savings Time was in effect at the time of the offense. Therefore, for the purposes of our analysis, we will proceed as if the alibi demand had expressed the period as "between 6:00 a.m. and 8:45 a.m. Central Daylight Time."

On March 8, 1999, the defendant filed a motion requesting an extension of time to file a notice of alibi:

> Comes the Defendant, Byron Looper, by and through counsel, Douglas A. Trant, to move the Court to permit the Defendant additional time within which to file his notice of alibi. Since the Defendant has been incarcerated, it makes it difficult to fully comply with the notice as to exact times and witnesses who are available. The Defendant would ask to have until June 23, 1999, which is a full sixty (60) days before trial and leaves the State ample time to investigate the witnesses, in order to file his notice of alibi.

On March 17, 1999, the State filed its opposition to the time extension requested by the defendant, reciting that the deadline already had been extended sixty days to April 23, 1999. Additionally, the State alleged that there were attempts to obtain "false testimony on behalf of the defendant."

Denying that an effort had been made to obtain false testimony, the defendant, on March 19, 1999, again asked for an extension of time to file a notice of alibi:

Comes the Defendant, Byron Looper, by and through counsel, Douglas A. Trant, to reply to the State's response to the Defendant's motion for additional time within which to file its notice of alibi. Initially, the Defendant and his counsel vehemently deny any allegation by the State that there is any effort to fabricate an alibi in this case. To investigate where a person was at a particular time is not as easy as the State tries to suggest. That is especially true when the Defendant, unlike the State, has very limited resources. The only time a person would remember exactly where they were is if they were committing a crime. When someone is at a place different than where a crime was committed, it takes some time to investigate witnesses who can recall having knowledge of the Defendant's presence at some place other than the scene of the crime. That is particularly difficult when the Defendant is incarcerated. The State would suffer no prejudice in having this notice served 60 days before trial because that would give them plenty of time to do their own investigation.

The attorney then representing the defendant filed a response on May 5, 1999, but with copies both to the State and the trial court on May 3, 1999, stating as follows:

Comes the Defendant, Byron Looper, by and through counsel, Douglas A. Trant, to state that Mr. Looper did not kill [the victim] and was not present at [the victim's] farm the day that he was killed. In that regard, pursuant to Tennessee Rule of Criminal Procedure 12.1(d), Mr. Looper reserves the right to testify at trial as to where he was at the time that [the victim] was killed.

By letter dated May 4, 1999, and filed May 5, 1999, the trial court informed defense counsel that the alibi response was inadequate and "nonresponsive to the State's notice:"

I received by fax on May 3rd your letter as well as a copy of a pleading denominated Response To Request For Notice Of Alibi. It appears that this pleading does not meet the requirements of Rule 12.1. The last sentence of that rule states, "Such a notice by the Defendant shall state the specific place or places at which the Defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the Defendant intends to rely to establish such alibi."

Unless you can provide me with some authority to the effect that your response complies with Rule 12.1, I would have to find that it is nonresponsive to the State's notice. Therefore, I extend to you

an opportunity to provide such authority; it to be received not later than one week from today's date or by May 11, 1999. If no such authority exists, you will be required to comply with Rule 12.1 in order to assert alibi as a defense.

Copies of this letter from the trial court were provided to the State and the clerk. A copy of the letter bears the clerk's stamp and handwritten file date of May 5, 1999. Subsequently, counsel who provided the alibi response was replaced by other counsel who, in turn, were replaced by yet other counsel who then represented the defendant at trial. However, no other response was provided for the State's alibi demand.

On August 11, 2000, the matter of alibi was discussed as the jury was being selected in Sullivan County:

> THE COURT: Now, I want to address something that is some concern to me, particularly before we begin voir dire, and that is, that in reviewing some of your jury requests, the ones that were forwarded to me by [defense counsel], there was some, if I read it correctly, there was – made some reference to an alibi charge, and I want to clarify that before we begin tomorrow, because we've had notice down since February of '99 on this issue.

> [DEFENSE COUNSEL]: Your Honor, our position on that is, it would be an appropriate charge if and only if the defendant chose to testify. The defendant being the only alibi witness that we have.

> [STATE]: And the state has some precedent that an alibi charge is not appropriate if it's just based on the sole testimony of the defendant.

> THE COURT: I'll consider that. So – I mean, I'll consider and read that. But now, the rule appears to have been complied with, with the state, over a year ago, and there's been no response to it. So, I'd like to look at both authorities, and I don't want that referred to in jury selection[.]

Subsequently, in his opening statement to the jury, defense counsel stated, "You're going to hear from these witnesses who were undisputedly with Byron Looper days before October 19th, on October 19th at certain times, and after October 19th."

At trial, Rick Dodson, a truck driver who had been driving on Interstate 40 in Cumberland County at approximately 8:30 a.m. on October 19, 1998, testifying as one of the State's first witnesses, said that he had seen "a bright orange flash" "coming from a pickup truck" on a road near

the interstate, and saw a "dark blue or black" car beside the truck. Later that morning, as he was traveling past that same point on his return trip to Knoxville, he saw that the pickup truck, now covered with a blue tarpaulin, was still sitting in the same place, "and the cops were all around." Although he had not been asked on direct examination about driving times between various locations, the following questions were asked by defense counsel during cross-examination:

Q. What kind of distances do you go?

A. Well, at that time, I worked normally 150 miles out of Bowling Green, Kentucky, and now I go 48 states.

Q. Okay. From – I guess you mainly stick to the freeways, don't you?

A. Well, whatever road that is legal for me to travel.

Q. Okay. How far, in your experience, or how long in time, in your experience – well, maybe you've never driven this route, from here to Chattanooga?

A. Yeah, I have in the past.

Q. What kind of times are we looking at?

A. Oh, I don't know. I don't know what the exact miles are. I'm guessing, probably two hours.

Q. Okay. And then, have you driven the Chattanooga-Atlanta corridor?

A. Sure.

Q. And what do you recall that could be done in?

A. It depends on what time of the day.

Q. Yeah. With Atlanta, that's especially true, isn't it?

A. Right.

Q. At the best time of day, when it's absolutely optimal?

A. Two, two and a half hours.

Q. This scene was well exposed to the interstate, wasn't it?

A. It was, yes.

Q. And pretty close, this little road was pretty close to the interstate, wasn't it?

A. It was.

These estimates of the travel time between Flowery Branch and Monterey are consistent with the testimony of Russell Duke, who testified as a State's witness and said that the drive from his home in Oakwood, Georgia, about five to seven miles from Flowery Branch, to the courthouse to testify had been four and a half to five hours.

During the defense proof, Reba Looper, the defendant's mother, was called and testified extensively about his background. She said that the defendant had come to her home in Flowery Branch, Georgia, on October 14, 1998, a week that she was on vacation. At the time, her other son, Russell, had "just finished college" and was living with her. She said that she had told her hairdresser, Barbara Reed, during an appointment on Thursday, October 15, that the defendant was visiting her. During her testimony, she produced a check, entered into evidence over the objection of the State, which had not previously seen the check, and said that she had told Barbara Reed of a house for rent near the Looper residence. She had last seen the defendant on Sunday afternoon, October 18, 1998, probably around "4:00 or 5:00" p.m. After the defendant left the house that afternoon, she "went in [his] room and cleaned it up, changed the bed, changed the sheets." She said that she arose at about 6:00 a.m. on Monday, October 19, and, after awakening Russell and taking the defendant's puppy, "Low Tax," for a walk, went to work.

Reba Looper said that she arrived home from work at about 6:00 p.m. on October 19, 1998, and, while watching the news on an Atlanta television station, heard the word "Monterey." She did not know if the commentary was about Monterey, Tennessee, or a town of the same name in another state, and asked her son, Russell, who knew of no news about "Monterey." Later, after Russell Looper had left to have dinner with his girlfriend, she looked outside and saw a man who then identified himself as Paul Loggins of the Georgia Bureau of Investigation. He inquired about the defendant, and she "told him Byron had been there." She then told of going into the defendant's room after Agent Loggins left:

Q. And what state did you find Byron's room in, particularly the bed?

A. Well, when the GBI came, I had only been in my bedroom, changed my clothes. I had not even gone to the bathroom. I had not done anything. So, after he left, I went to the bathroom. Towels were

on the floor, the shower was in disarray, so I could immediately tell Byron had been there and taken a shower.

Q. Well, how do you distinguish a Byron shower from a Russell shower?

A. It takes three towels for Byron to take a shower; two to walk on, and one to dry on. The shower is quite disorderly.

Q. Well, what is the condition when Russell takes a shower?

A. He's a lot neater.

Q. Will you tell the jury . . .

A. No towels.

The State then objected to Ms. Looper's testimony, asserting that it was presented as alibi proof:

[THE STATE]: Your Honor, may we object at this point, enter an objection and approach the bench?

THE COURT: Yes, sir.

(The following proceedings were had at the bench by the Court and counsel out of the hearing of the jury:)

[THE STATE]: Your Honor, the state has previously requested and the Court has ruled as to an alibi defense.

THE COURT: Uh-huh (yes).

[THE STATE]: At this point, the state is contending that they are presenting alibi testimony from this witness as to the defendant's whereabouts at the time of the murder based on what she observed, and we're objecting to it.

[DEFENSE COUNSEL]: Your Honor, she's gone nowhere near this. They requested a specific time in their alibi defense. She's talking about something that could have happened Sunday night. It could have happened Monday night.

-21-

> THE COURT: Overrule the objection at this point, and I'll allow you
> to ask all of those questions in cross.

Continuing her testimony before the jury, Ms. Looper said that she had "made" the defendant's bed on Sunday, but that it was "[u]nmade" when she went into his bedroom on the afternoon of Monday, October 19, 1998. Additionally, she said that Russell had left the house that morning before she did, and that the bathroom was in "[g]ood shape" when she left. Amplifying her description of the bathroom, she said that "[t]he shower curtains were closed, the towels were all put up. Everything was neat. There was nothing out of order." When TBI agents interviewed her the following Wednesday at her workplace, she did not tell them about "the bathroom and the bed in the states of condition that they were in" because she was "very upset" that her supervisor was not allowed to be with her during the questioning. She said that Flowery Branch was "[a]pproximate[ly] 50 miles" from Atlanta.[1]

Following the testimony of the defendant's mother, the trial court addressed, out of the presence of the jury, the State's complaint that the defendant was attempting to present alibi testimony:

> THE COURT: You know, I raised this before we even began, and I
> let this last witness testify on this issue, but this notice that the state
> filed on this – under Rule 12 of alibi, was produced and presented
> better than a year and a half ago. There's been no response to it.
>
> [DEFENSE COUNSEL]: Nor will there ever be, Your Honor. It's
> time specific. We have no way to account, other than the defendant
> himself, as to his whereabouts.
>
> THE COURT: And they're entitled to the notice, as it's requested
> under the rules, as to who it will be that will vouch for those periods
> of time.
>
> [DEFENSE COUNSEL]: That's correct. We have no . . .
>
> THE COURT: We haven't had that. So, what you're doing is
> circumstantially coming in the back door here.
>
> [DEFENSE COUNSEL]: That is correct.
>
> THE COURT: And I don't know that that's appropriate.

---

[1]We take judicial notice that Flowery Branch is northeast of Atlanta.

[DEFENSE COUNSEL]: They limited a time. We didn't, Your Honor.

THE COURT: Well, they were required to, under the rule.

[DEFENSE COUNSEL]: And they gave the time. And we are explaining his whereabouts after the time specified.

THE COURT: So, you will not be able to discuss those times.

[DEFENSE COUNSEL]: We understand that, Your Honor, nor do we intend to.

[THE STATE]: Your Honor, may I respond to that?

THE COURT: Yes, sir.

[THE STATE]: Your Honor, if the state was required to give time frames that were . . .

THE COURT: And you did.

[THE STATE]: The time that we have given there is the time of Byron Looper upon the murder scene, but the defendant would have to respond, if he were in Puerto Rico at that time, for instance, that he were there, or that he were traveling, and that he could not have been at that place at that specific time.

[DEFENSE COUNSEL]: He would only have to respond if he had witnesses to testify to that. We have no one to testify to where he was at that time, and that is what [the State] is making reference to. I agree with him one hundred percent, but we have no witness to speak to Byron's presence at that particular time.

[THE STATE]: But what Reba Looper has testified to will be tied to the fact that he could not have been in Cookeville, because he was taking a shower in her home, and that is not proper when this notice is given.

. . . .

THE COURT: I'm going to agree as to that respect. So, if we continue down that line, I'm going to sustain the objections on those time frames.

[THE STATE]: And there will be . . .

[DEFENSE COUNSEL]: On those time frames, we understand that, Your Honor.

THE COURT: Yes, sir. Or circumstantially any other way associated with their notice.

[THE STATE]: As to any time that would make him . . .

[DEFENSE COUNSEL]: (Interposing) Your Honor, . . .

[THE STATE]: Your Honor, if he was in Japan, the time frame might be two days because . . .

[DEFENSE COUNSEL]: The fallacy of the prosecution's argument is the following: If notice is given, the defendant has an obligation to respond and give the names of any witnesses who would testify to his location anywhere other than the crime scene at the time specified. We have no one to speak to that issue.

THE COURT: "A". There has been no response to it.

[DEFENSE COUNSEL]: But that is previous counsel.

THE COURT: Call your next witness.

[DEFENSE COUNSEL]: Your Honor, we'll do it collaterally on some other way.

The parties continued to present arguments on this issue, with the defense explaining that they were presenting no witnesses as to the defendant's whereabouts at the time the victim was killed:

[DEFENSE COUNSEL]: [A]ny speaking to where Byron Looper was during the hours delineated in the state's demand for notice can only come from Byron Looper, because we have no witnesses to speak to those particular hours. The state didn't ask an accounting of Mr. Looper's entire day. It asked for where he was during specific

-24-

hours. The issue of his not being in Monterey is specifically addressed. His presence elsewhere cannot be addressed by the witnesses we're proffering because they don't know where he was at that time. Only Mr. Looper knows that, and if he chooses to testify, he will share that with us.

THE COURT: But the last witness was presented to establish circumstantially a fact which would be in effect an assertion of an alibi, and that appears to circumvent, or attempt to circumvent the clear mandate of Rule 12.

[DEFENSE COUNSEL]: Your Honor, we don't share the Court's view.

THE COURT: Well, do you have any authority that would support your view?

[DEFENSE COUNSEL]: I think we can look to cases previously cited by the prosecution. I had the opportunity to walk through the Howard Baker, Jr., Senator Howard Baker, Jr., r[o]tunda, the University of Tennessee Law School this weekend, and after marveling at its beauty, I went to research the cases previously cited by the prosecution, or I should say, miscited by the prosecution.

. . . .

An alibi defense is invoked by the defendant himself if he chooses to take the stand, and corroboration may be necessary before the Court sua sponte must give the instruction. But there is nothing to suggest in those cases that anything that Mr. Trant did was outside the rule. If Mr. Trant did something outside the rule, I fear for the prosecution, because should they be so fortunate as to get a conviction, despite the paucity of evidence they have produced, then we will be revisiting this issue through habeas corpus, and the competence of Mr. Trant will well become the focus and the issue.

THE COURT: Okay. Yes, sir, you had something you want to present?

[THE STATE]: Nothing further, just a letter from this Court dated May 4th to Mr. Trant, and it makes a finding, and I quote from it: "Unless you can provide me with some authority to the effect that your response complies with Rule 12.1, I would have to find that it's

nonresponsive to the state's notice," and you extended to him an opportunity to find some authority.

So, what they have filed is something that has been determined to be nonresponsive as an alibi notice.

THE COURT: Okay. I want to make you file that – make sure we've got . . . Oh, you found it for me, have you?

DEPUTY CLERK SMITH: Yes.

THE COURT: Okay, good. Where is my letter? Do you have it there, in response to this? Apparently, he's reading a letter that I sent Mr. Trant. What was the date of the letter? I'm sure it's in the correspondence file at the clerk's office.

[THE STATE]: It's dated May 4th. I was reading from paragraph 2. And there is a reply from Mr. Trant the next date that addresses the defendant's right to testify in his own behalf.

[DEFENSE COUNSEL]: Your Honor, that's not a document to which we are privy. Mr. Trant apparently has not felt it appropriate or necessary to give us documents that he would have received in return.[2]

THE COURT: Here, I'll let you look at it.

(Counsel for the defense reviews document.)

[DEFENSE COUNSEL]: It appears to be a restatement of what Mr. Trant had filed previously.

DEPUTY CLERK SMITH: Be May 4th of '99?

THE COURT: Yes, uh-huh. And May 5th, the response from Mr. Trant. Here are the two documents. I want to make sure the record has that in there.

[THE STATE]: We'd just like to request an order that, before they go into it in the presence of the jury, they have a jury-out.

---

[2]We note that two other attorneys had represented the defendant in the interim.

THE COURT: Yeah. And I'm going to have to say to you that, I don't find that Rule 12 has been complied with here, and I'm going to cut that testimony off, so. And I agree with you, if Mr. Looper takes the witness stand, he may assert it, but the state was fair in their notice under Rule 12, and there hasn't been a reply that complies with Rule 12.

[DEFENSE COUNSEL]: Your Honor, I can't speak for Mr. Trant, though I can imagine his reasoning. I suspect, and the state has narrowed its parameters, surely Mr. Trant has properly responded to those parameters. I understand the Court's ruling. I would make certain offers of proof. I would also ask the Court for guidance in the following fashion: Should Mr. Looper take the stand, is the Court then saying that that which would be physically corroborative, but not testimonial corroborative, of the – I shouldn't say that. Physically corroborative, but not direct testimony of his whereabouts at the time of the murder, is the Court going to preclude that?

THE COURT: I'm going to have to listen to each one of those issues . . .

[DEFENSE COUNSEL]: Well, Your Honor, . . .

THE COURT: Because clearly, the notice requirement here is to put the state on even footing so that they can respond to what efforts that are being made in the furtherance of the alibi defense.

Subsequently, the three witnesses whose testimony placed the defendant in Flowery Branch, Georgia, as early as an hour and fifteen minutes after the period set out in the State's Rule 12.1 alibi request, testified out of the presence of the jury.

[DEFENSE COUNSEL]: Your Honor, before the jury comes back in, we'd like to call in a witness, two witnesses, actually, perhaps three, and make an offer of proof of the type of testimony that the Court has preliminarily indicated it's not going to allow, and just out of an abundance of caution so that we don't have that brought up in examination before the jury, we'd like to offer it at this point.

THE COURT: Are you talking about on the alibi?

[DEFENSE COUNSEL]: It's not clearly alibi, Your Honor, and that's my point. It concerns periods of time not in the state's brackets

of requirement. None of the three witnesses have anything to do with those periods of time.

. . . .

THE COURT: All right, I've been handed the case of State versus Coury, 697 S.W.2d 373, which is annotated behind the rule. I read it at lunch prior to this being identified, and I've had my law clerk also engaged in doing some research on the issue as well. So, I'm willing to hear the offer of proof. I'd say this is as good a time as any other.

Barbara Reed testified that she was a hairdresser in Flowery Branch, Georgia,[3] and had "been doing Reba[] [Looper's] hair about 20 years." On October 15, 1998, Ms. Looper told her about a house for rent in her neighborhood, and she went on Monday, October 19, a day off from work, to look at the house. She described what she saw as she arrived at the house, which was off Paradise Point Road:

Q. On the way to the Paradise Point location, at 11:00, or somewhere around that time, what time was it when you passed Reba Looper's house?

A. About 11:00, 11:00.

Q. All right. Did you observe anyone or anything?

A. Yeah, I just saw Byron playing with his dog in the front yard.

Q. And that's 11:00 or . . .

A. Uh-huh (yes).

Q. That time?

A. Yeah, close to it.

Q. Okay. On the 19th of October, 1998?

A. Uh-huh (yes).

---

[3]Flowery Branch, Georgia, is located in the Eastern Time Zone. Although the witnesses from Flowery Branch did not so specify, we presume that the various times to which they testified were expressed as Eastern Daylight times.

During cross-examination, Reed said that in June 1999 she and Ms. Looper had "started talking about things" and, upon being reminded of learning about the rental house from Looper, Reed then "told her that [she] had saw [sic] Byron" on October 19, 1998. At the time of this conversation, the two were in the beauty shop where Reed worked, and no one was with Ms. Looper. She said that another reason she knew "it was the 19th, because we'd had a birthday party on the 18th" for herself and her nephew.

Paul Voelker testified that he was a neighbor of Reba Looper in Flowery Branch, Georgia. He specifically remembered the weekend of October 17, 1998, two years earlier, because on that day, "which was the start of [his] vacation, [he] came home from work around noonish in a really pissed-off mood." He worked at Kroger store number 324 in Dunwoody, Georgia, on the midnight shift. The following morning, Sunday, October 18, he noticed a blue Beretta automobile, which he had never seen before, parked on the grass in front of Ms. Looper's house. On Monday, October 19, he saw that the car was still parked in Ms. Looper's yard. As he was sitting on his porch, "[s]omewhere between 11:00 and noon," he saw two men, one of whom he recognized as Russell Looper, come out of Ms. Looper's house. He saw the second man again that day as the man was driving away from Ms. Looper's house around 2:00 p.m. Voelker identified the second man as the defendant. Voelker said that "[i]t's like 63 feet" from his porch to that of Ms. Looper, and that he had observed the defendant by using a monocular.

Voelker said that he had not spoken with Reba Looper about this matter until July 2000, when "she told [him] that she was – they just needed to find someone in the neighborhood that had seen [the defendant]." At the end of July 2000, less than two weeks before jury selection began, he told the attorneys representing the defendant at the trial that he had seen the defendant the day of the homicide. He said that he had not told TBI agents who had interviewed him on October 21, 1998, about seeing the defendant two days earlier because they asked if he "had seen a car that they described sitting in the front lawn of the house." However, the name "Byron Looper" was not mentioned by them; and he was asked by an agent of the Georgia Bureau of Investigation, in November 1998, only to report if he saw the cocker spaniel dog, "Low Tax."

Russell Looper, the defendant's brother, testified that in October 1998, he was living at his mother's house in Flowery Branch, Georgia. He said that on Monday, October 19, 1998, he had seen the defendant "going out when [he] was coming in" for lunch "[a] little bit before noon." He returned to the residence after work, between 4:00 and 5:00 p.m., and did not see the defendant. On Friday or Saturday of that week, he learned that his brother had been charged with the victim's murder. He said that he talked with two TBI agents on October 21, but did not remember telling them that he had last seen the defendant the Thursday or Friday of the previous week, explaining "that was a relatively stressful time in our lives."[4]

---

[4]As to this testimony, the defendant argues that he "is therefore entitled to the missing witness inference – this Court may infer that had the agents been called, they would not have contradicted Russell Looper." However, we disagree with this assertion. As explained in Neil P. Cohen et al., Tennessee Law of Evidence § 4.01[14][a] (4th ed. 2000), the permissive inference resulting from a missing witness permits either a missing witness instruction or

(continued...)

During cross-examination, Russell Looper was questioned about when he first revealed that the defendant had been in Flowery Branch the day of the homicide:

> Q. And at what point did you come forward and make that information known?
>
> A. As I said – to whom are you asking?
>
> Q. Well, let me step back. That was important, wasn't it?
>
> A. Yes, it was.
>
> Q. And it's important – the importance is clear here today. You're an alibi witness for him; right?
>
> A. Right.
>
> Q. You came to the preliminary hearing?
>
> A. Yes, I did.
>
> Q. And did you talk to his attorneys that day and say, "Hey, I saw Byron this morning, the morning of this murder"?
>
> A. I don't remember when the first day was that I was with them.
>
> Q. But you learned the facts at the preliminary hearing when the murder took place?
>
> A. Yes, what – what day it took place, yes.
>
> Q. And you knew in your mind at that time you had seen him. . .
>
> A. Yes, I knew it.

[4] (...continued)

appropriate closing argument "not[ing] the absence of the witness and ask[ing] the jury to draw a negative inference from the absence." In the present appeal, the matter arose during a hearing on whether the undisclosed alibi witnesses would be allowed to testify before the jury. Since the witnesses were not allowed to testify, the inference is not applicable. Further, we note that during the State's presentation of proof, neither Lisa Lingwall nor Gerald Presley, the two TBI agents who had questioned Russell Looper, testified. Since the State had rested four days before Russell Looper was called to testify, and the State had no reason to know that he would be presenting an alibi for the defendant, there would not appear to have been any reason for the State to have these two agents available to refute that which they could not have anticipated.

Q. . . . in Georgia?

A. Yes.

Q. And he couldn't have been at the murder scene?

A. If – to the best of my knowledge, when that took place, there was no time frame established with when that had taken place.

Q. At the preliminary hearing, . . .

A. Yeah, I don't. . .

Q. . . . you didn't understand the time frame?

A. I don't – I don't recall there being a specific time frame stated, no, sir.

Q. But you – you're – what kind of education do you have?

A. Well, I have a high school education, and a majority of a bachelor's degree.

Q. Okay. And you realized that you had seen your brother at noon, 11:00 central time on the date that he was accused of killing [the victim]?

A. Right.

Q. But you never came forward to tell anybody?

A. Right.

Q. Until when?

A. Until later that – a couple of months, I guess.

Q. A couple of months after the killing?

A. That's when – when – the next time that I saw his attorneys, that's when I spoke with them.

Q. What attorney?

A. I don't recall which one it was, to be honest with you.

Q. Not these?

A. No. They weren't on the case at that time.

Q. Was it Mr. Trant?

A. I don't know, to be honest with you.

Q. Was it at or about the time of the preliminary hearing?

A. I believe it was after that point.

Q. How much after?

A. I don't remember, to be honest with you.

On redirect examination, he was asked to identify which of the defendant's previous attorneys he had told of the fact that the defendant had been in Flowery Branch the day of the homicide:

> Q. Mr. Looper, when you spoke to the attorney that represented your brother before Mr. Cordova and I, do you remember his name?
>
> A. I don't. I'm sorry.
>
> Q. Did you speak to him in person or over the telephone?
>
> A. I can't recall, to be honest with you.
>
> Q. Does the name Doug Trant from Knoxville. . .
>
> A. I remember Mr. Trant, but I can't, you know, specifically remember if it was he or another attorney.
>
> Q. Larry Warner, Howard Upchurch, Jerry Burgess, Lionel Barrett? Do any of those names ring a bell?
>
> A. You know, there was [sic] conversations between several and different ones, you know. I spoke with Mr. Burgess on several occasions.

Following the testimony of Russell Looper, the attorneys argued at great length as to whether the three witnesses should be permitted to testify before the jury. The defense noted that both Paul Voelker and Russell Looper were known to the State because both had been interviewed by TBI agents. Additionally, they contended that a proper response had been made to the State's alibi notice demand:

> In the case at bar, there is a demand narrowly specified, parameters are limited. We're told that the state has interest in the alibi as to the hours 6:00 A.M. to 8:45 A.M. Central Time, and that would be transliterated to 7:00 A.M. to 9:45 A.M. Eastern Time. The response in the case at bar, and the response itself differs from the situation in <u>Coury</u>, is to answer that time specific question. (A) is answered, (B) is answered, and (C) is answered. At the very least, Your Honor, and I respectfully suggest that to do otherwise would be to risk reversal of the conviction we believe will never occur, at the very least, Paul Voelker's testimony must be admitted, because the state had knowledge of the witness's existence at least, at least 20 months before the defense.

The State responded that the defense had "known about this [testimony] for months, and they made an intentional strategic decision to not disclose it to the state:"

> Your Honor, in this particular situation, in this case at bar the prejudice that would result to the government from the defendant's failure to disclose is great. It's an ambush. They've brought in three witnesses. At least one of which was interviewed in the past, he's changed his story. The prejudice suffered by the defendant if the sanction of exclusion is employed is minimal. The reasons for nondisclosure in this case, Your Honor, are obvious. They've known about this for months, and they made an intentional strategic decision to not disclose it to the state, and the purpose, the only reason for that strategic decision would be to ambush the state with this information. We had some discussion of alibi even as late as the jury selection process in Sullivan County. The defense was well aware they were going to call these witnesses, and they made no mention of it. It was in the context of whether or not an alibi charge would be given by the Court based solely on the testimony of the defendant.

The defense responded that if the State had been adversely affected by not having advance notice of the three witnesses, it should be granted time to refute their testimony:

> If the state truly believes that it has suffered a detriment, then let the state interview the witnesses, let the state have as much time as it

-33-

needs to refute the witnesses, if refute the witnesses it can. Most importantly, these witnesses speak not to alibi in its literal and legal sense. They speak to an issue pennon-braided [sic] by McCracken Poston in his opening statement, when McCracken Poston said: "The defendant Byron Looper did not kill Senator Burks, could not have killed Senator Burks, and would not have killed Senator Burks." We mean to establish the first by reason of the latter two. We've already attempted, I believe succeeded in establishing the one, there is no reason. We now show that he could not physically have done so. That is not alibi. What we are providing through these witnesses is, that he could not have been in Tennessee . . .

THE COURT: Is that not an alibi?

[DEFENSE COUNSEL]: That is not alibi, Your Honor. That is not an alibi. An alibi is, that he was elsewhere, not that he was not in Tennessee. It is a person speaking to . . . where he was at the time of the murder, and there is no one other than the defendant who can speak to that.

The trial court concluded that the defense was attempting to present alibi proof and ruled that, because the defense had not properly responded to the alibi notice request, the testimony of Barbara Reed, Paul Voelker, and Russell Looper could not be presented to the jury:

All right, let's talk about the last avenue of your attack, in which you basically are placing this responsibility on Mr. Trant. Historically, you have to point out that this record will demonstrate the proper notice under Rule 12, February the 17th, 1999, an opportunity to extend the period of time for Mr. Trant to respond, and later that year, a response from Mr. Trant, which has been identified earlier, which this Court found to be not satisfactory, and that response communicated to Mr. Trant. But the more important issue here is, that I recognized the request of the defense team for an alibi in their response to my inquiry about jury instructions, and I queried the defense, current defense team, in Blountville about this issue, and was given the response, as previously been advanced, that this didn't deal with alibi. If it was to be advanced, Mr. Looper would be the sole witness.

So, it appears to me that this current defense team was knowledgeable in all respects of the peril associated with Rule 12, and Rule 12 is very specific. The state has met its requirement to notice over a year ago. This defendant, his current team, as well as

-34-

his predecessor team, has known of the particular notice, and they have not responded to it. Knowledge of a particular witness does not equate to knowledge that witness will be used for an alibi. And if I were to construe Rule 12 in the very limited way that is advanced by the defense team, this rule would have no value, or purpose, or reason whatsoever. It cannot be read in that manner.

So, for all of those reasons, your request is denied, and these witnesses are excluded.

The trial court allowed defense counsel to make a statement for the record as the defense was preparing to present another witness:

Your Honor, before we do, I'd like simply to put on the record two observations. And if my recollection differs from the Court, I apologize.

But the question that was propounded to counsel was couched as if the defendant were to take the stand. Indeed, we submitted to the Court, and therefore we gave the Court notice, that if the defendant did take the stand, he would be entitled to an alibi instruction.

With regard to the issue of whether or not the proffered witness, particularly Paul Voelker, spoke to an alibi or to some other aspect of the case, I would point out to the Court that which might not seem obvious, it is not impossible for Byron Looper to have been in Monterey at 8:30 in the morning and been in the Gainesville, Georgia area at 11:30 that same morning.

Thus, during arguments to the trial court as to Georgia witnesses who would testify that the defendant was in Flowery Branch late on the morning of the crime, the defense asserted that this testimony would show both that he could have been near the crime scene during a portion of the period in the alibi demand, "it is not impossible for Byron Looper to have been in Monterey at 8:30 in the morning and been in the Gainesville, Georgia area at 11:30 that same morning," and that he could not, "[w]hat we are providing through these witnesses is, that he could not have been in Tennessee."

We do not understand the purpose of counsel's asserting the defense testimony of the Flowery Branch witnesses would have allowed the defendant to have been in "Monterey" at about the time the victim was killed at his farm. First, the alibi notice specified that the crime occurred at the victim's farm; and, the defendant's response stated that he was not at the victim's farm on the date of the crime. It is not clear whether the defendant's trial counsel was contradicting this response, believing these two locations to be the same, or whether he was claiming that, while the

defendant was not at the victim's farm the day of the homicide, he could have been in Monterey during a portion of the period in the alibi demand and later that morning in Flowery Branch. Additionally, we are not certain of the significance of "8:30" and "11:30" or of the three-hour gap in these times, and whether both are expressed as being in the same time zone. Although 8:30 a.m., Central Daylight Time, was the approximate time of the shooting, the defendant's Georgia witnesses placed him in Flowery Branch as early as 10:00 a.m., Central Daylight Time, approximately an hour and a half after the crime. To review the issue of exclusion of the witnesses, we will presume that successor counsel was speaking of the scene of the crime by referring to "Monterey."

The benefit to the defendant of these contradictory arguments is apparent. Claiming that he was in Monterey for only a portion of the period set out in the alibi demand notice enabled the defendant then to argue that proof of his being in Flowery Branch later that same morning was not proof of alibi, because such proof must cover the entire period in which the crime was committed. Yet, by then arguing the reverse, that being in Flowery Branch made it "impossible" for the defendant to have been in Monterey to commit the crime, the non-alibi had the evidentiary effect of an alibi.

To assess the defendant's varying claims that the trial court erred in excluding the testimony of Barbara Reed, Paul Voelker, and Russell Looper, we will review the applicable law.

The circumstances under which a defendant must inform the State that an alibi defense will be presented are set out in Tennessee Rule of Criminal Procedure 12.1, which provides:

> (a) Notice by Defendant. Upon written demand of the district attorney general stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the district attorney general a written notice of an intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom the defendant intends to rely to establish such alibi.

> (b) Disclosure of Information and Witness. Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the district attorney general shall serve upon the defendant or the defendant's attorney a written notice stating the names and addresses of the witnesses upon whom the state intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.

(c) Continuing Duty to Disclose.  If prior to or during trial a party learns of an additional witness whose identity, if known, should have been included in the information furnished under subdivision (a) or (b), the party shall promptly notify the other party or the other party's attorney of the existence and identity of such additional witness.

(d) Failure to Comply.  Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense.  This rule shall not limit the right of the defendant to testify in his or her own behalf.

(e) Exceptions.  For good cause shown, the court may grant an exception to any of the requirements of this rule.

(f) Inadmissibility of Withdrawn Alibi.  Evidence of an intention to rely upon an alibi defense, later withdrawn, or of statements made in connection with such intention, is not admissible in any civil or criminal proceeding against the person who gave notice of the intention.

Reviewing the intended testimony of the three excluded witnesses, the defendant on appeal argues that "[f]or purposes of Rule 12.1, 'alibi' testimony should be construed to encompass only that specific time period designated by the State in its demand for notice."  Thus, by this view, the State's alibi demand did not require disclosure of these witnesses.  In reviewing the efficacy of this claim, we first will ascertain whether the excluded witnesses were, as the trial court determined, "alibi" witnesses.

Barbara Reed, Reba Looper's hairdresser, testified as to these main points: on Monday, October 19, 1998, (1) she was looking for a house to rent and looked at an available house in Reba Looper's neighborhood; and (2) while looking at the house at 10:00 a.m., Central Daylight Time, she saw the defendant, playing with his dog, in the front yard of Reba Looper's house in Flowery Branch, Georgia.

Paul Voelker, a neighbor of Reba Looper, testified as to these main points: (1) on Monday, October 19, 1998, between 10:00 and 11:00 a.m., Central Daylight Time, he saw Russell Looper and another man on Reba Looper's front porch in Flowery Branch, Georgia; (2) at about 1:00 p.m., Central Daylight Time, later that day, he saw the same man get into a car and drive away; and (3) the man he saw on both occasions was the defendant.

Russell Looper, the defendant's brother, testified as to this main point: he went home for lunch in Flowery Branch, Georgia, a "little bit before noon"on Monday, October 19, 1998, and, as he entered the house, the defendant was leaving.

Thus, various items of information, much of it unrelated, were presented by these witnesses. However, the common element in their offered testimony was that on October 19, 1998, as early as 10:00 a.m., Central Daylight Time, one hour and fifteen minutes after the period set out in the State's alibi demand, the defendant was in Flowery Branch, Georgia, a four-and-a-half- to five-hour drive from the crime scene. The practical effect of this claim, if true, would be to establish the geographic impossibility of the defendant's killing the victim. However, this evidence was not "alibi" proof, according to the defendant, for two reasons: (1) it established his whereabouts only outside the period in the State's alibi demand, saying nothing of where he was during the period; and (2) since being in Flowery Branch also allowed him to have been in Monterey during a portion of the period in the alibi demand, his proof was not of alibi which must cover the entire period when the crime was committed.[5] Thus, by the defendant's argument, witnesses establishing his whereabouts outside the period in an alibi demand were not required to be disclosed because it was not proof of alibi.

To support this view of what is not required to be disclosed pursuant to an alibi demand, the defendant relies upon several sources. He points out that in Christian v. State, 555 S.W.2d 863, 866 (Tenn. 1977), our supreme court defined alibi as "evidence which if believed would establish that the defendant was not present at the scene of the alleged crime when it allegedly occurred." Additionally, he notes that in 11 David Louis Raybin, Tennessee Practice: Criminal Practice and Procedure § 28.20, at 15 (1985), it is said that "[a]libi is a claim by the defendant that he was elsewhere at the time of the offense and therefore could not be the person who committed the offense." Utilizing these definitions of "alibi," the defendant argues that "[t]he proffered testimony of Barbara Reed, Paul Voelker and Russell Looper was not 'alibi' evidence," because they testified only as to a time following the period set out in the alibi demand.

The defendant's view of an alibi, used to avoid the disclosure requirement, ignores the function of an alibi. Black's Law Dictionary 72 (7th ed. 1999) defines "alibi" as "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time."[6] To establish the materiality of the testimony, and resulting harm because of its exclusion, the defendant, in fact, utilizes the "geographic impossibility" of his having committed the crime, which the excluded witnesses would have established.

---

[5] On appeal, the defendant repeats this argument, applying the principle that an alibi must cover the entire period in which the crime was committed, asserting "the presence of the shooter quite obviously was no longer required to accomplish the crime after the fatal wound was inflicted."

[6] As we have noted, among the arguments of trial defense counsel as to why the witnesses from Flowery Branch, Georgia, should be allowed to testify, counsel said of their testimony, "We now show that he could not physically have [killed the victim]."

If the distance and means of travel would have permitted the defendant both to have been at the victim's farm to commit the crime and, later that morning, to have been in Flowery Branch, the proof would not have established an alibi. However, since the trial testimony established the impossibility of his being in both places at the relevant times, proof that he was in Georgia would have established an alibi, contrary to the refusal of one of the defendant's arguments to so recognize. The time and distance components of alibi proof were explained in Owens v. State, 809 So. 2d 744, 746-47 (Miss. Ct. App. 2002):

> Black's Law Dictionary suggests that the defense requires evidence that the defendant's location at the relevant time was "so removed therefrom as to render it impossible for him to be the guilty party." Black's Law Dictionary 71 (7th ed. 1999). Thus, a defendant in close enough physical proximity to have committed the crime may deny the criminal activity and may affirmatively assert that he was elsewhere at the critical time. However, if the asserted alternate location is such that, based on the version of events contended for by the defense, it would remain within the realm of physical possibility for the defendant to have committed the crime, then the defense is nothing more than a denial and would not rise to the level of alibi.

Although arguing that we should not apply its holding, the defendant recognizes what, apparently, is the only Tennessee decision considering proof of alibi by inference or implication, State v. Coury, 697 S.W.2d 373 (Tenn. Crim. App. 1985), where a defense witness testified that he had seen Coury in Mesa, Arizona, between 7:00 a.m. and 7:30 a.m. the morning of the 5:15 p.m. sniper shooting in Williamson County, Tennessee. As to this witness, the issue raised on appeal was whether the trial court had erred in allowing the State to question him about his 1956 Tennessee conviction for grand larceny:

> Initially, we note that the State objected to Francis's testimony on the grounds that no alibi notice was given, as such is required by Tenn. R. Crim. P. 12.1. Coury's counsel argued that he merely wanted to show that Coury was in Arizona on the morning of June 15, 1981, and that he was not attempting to set up an alibi defense. If, as argued by Coury's counsel, the testimony was not for the purpose of an alibi defense, then such testimony was irrelevant.

> At any rate, it is obvious that the import of Francis's testimony was to leave the inference with the jury that if Coury was in Arizona on the morning of the shooting, then he could not have been present in Tennessee at the time of the shooting that afternoon. Thus, the clear purpose of the testimony of Francis was to alibi Coury. As such, none of Francis's testimony should have been admitted by

> reason of Coury's failure to comply with the alibi notice mandate of
> Tenn. R. Crim. P. 12.1.

Id. at 379-80.

The defendant, reporting that Coury had not been cited subsequently by any court on the issue of alibi, argues this part of the holding is dicta and that it "is an aberrant decision which should not be followed as to what is or is not 'alibi' evidence." Although this portion of the Coury holding may be dicta, it certainly is not an aberration, for the essence of an alibi is the physical impossibility of a defendant's having been at the scene when the crime was committed.

The holding in Coury demonstrates one of the problems created by the defendant's arguing both that the evidence of his being in Flowery Branch the late morning of the crime did and did not establish an alibi. If it did not, as one claim asserts, then the proof was not admissible, Coury explaining that evidence of a defendant's location, if not used to establish an alibi, is "irrelevant." If it did establish an alibi, as his other claim contends, Rule 12.1 required timely disclosure of the identities of the Flowery Branch witnesses.

Contrary to the defendant's view, the holding in Coury is not an aberration. Rather, time and distance considerations are essential components of an alibi, as explained in Greenhow v. United States, 490 A.2d 1130 (D.C. Ct. App. 1985):

> "[Alibi] involves the impossibility of accused's presence at the scene of the offense at the time of its commission. . . . The defense of alibi is designed to prove that accused, during the whole time that the crime was being committed, was so far from the place where the crime occurred that he could not have participated in it, or that he was so far away that he could not, with ordinary exertion, have reached the place in time to have so participated in the crime; and in order to be legally effective it must cover the entire time during which the crime is alleged to have been committed."

Id. at 1134 (quoting 22 C.J.S. Criminal Law § 40, at 130-31 (1961)).

Other cases demonstrate the universal recognition of the time and distance components of alibi and show that it may be proven inferentially, as recognized in Coury. The defense attempted to prove an alibi in this fashion in State v. Nunn, 273 A.2d 366 (N.J. Super. Ct. App. Div. 1971), wherein the two Nunn brothers were alleged to have carnally abused a fourteen-year-old girl after 2:00 a.m. on November 7, 1968, in a field behind their house. Although a New Jersey statute required that advance notice of alibi proof be provided to the prosecution, the defendants did not advise until the beginning of the trial of their intention to call their mother and sister as witnesses, with both to testify that the brothers had gotten home at 11:30 p.m. on November 6 and gone to bed. The trial court granted the state's motion to exclude this testimony, because notice had not been

given to the prosecution. Following their convictions, the brothers argued on appeal "that they were not obliged to specify witnesses who had only circumstantial knowledge of [their] whereabouts at the moment of the commission of the offense." Id. at 368. However, the appellate court explained that disclosure was required also of circumstantial evidence of alibi:

> Whether the testimony of the proposed witness shows directly that a defendant was not physically present at the precise time and place of the alleged offense, or does so only inferentially, its purposes and objectives are the same. The difference is the weight and degree of persuasiveness attributed to that testimony by the jury. There is no less reliance by defendant on such testimony nor less need for notice by the State that it will be offered.

Id. at 370.

Other cases illustrate the requirement that an alibi cannot be established by showing a defendant's location before or after a crime unless the time and distance were such that the defendant could not have committed the crime. Establishing geographic impossibility by showing the defendant's whereabouts prior to the crime was utilized for an alibi claim in Commonwealth v. Blystone, 617 A.2d 778 (Pa. Super. Ct. 1992), although disclosure of the proof was not an issue. The defendant, charged with arson for setting fire to a farmer's milkhouse, argued that the state's proof was insufficient because, at the time the fire began, he was working at Domino's Pizza, a ten-minute drive from the scene of the arson. Affirming the conviction, the court recognized that the defendant had attempted to establish an alibi by proving that, shortly before the crime, he was at a location sufficiently distant from the scene of the crime that he could not have committed it:

> "Alibi is a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party." Commonwealth v. Gainer, 397 Pa.Super. 348, 353, 580 A.2d 333, 336 (1990). Here, several defense witnesses testified that on February 14, 1990, Blystone was at work until 2:00 in the morning. Based on this testimony, Blystone argues that he did not have sufficient time to drive to the farm and set the milkhouse on fire before 2:15 a.m. when the owners of the farm telephoned the fire department.

Id. at 780. However, a witness saw the defendant's automobile, with a Domino's pizza sign on the roof, in the vicinity of the fire forty-five minutes before the victims reported the blaze to the fire department. See State v. Hubbard, 711 So. 2d 393, 396 (La. Ct. App. 1998) (testimony that the defendant was in Houston, Texas, a six-and-one-half-hour drive from Rayville, Louisiana, on Sunday and Monday, did not provide an alibi for the charge that he had sold illegal drugs in Louisiana on Saturday); Glover v. State, 458 S.E.2d 538, 540 (S.C. 1995) (defendant did not establish an alibi

with testimony that he was in Florida between 8:00 a.m. and 8:30 a.m. the morning of the crime, which occurred eleven hours later in Williamsburg County, South Carolina, a six-and-one-half-hour drive from the place of the crime, the distance not making it physically impossible for him to have driven from Florida to South Carolina to commit the crime).

Although the defendant relies upon a number of cases to support his claim that he was not attempting to present proof of alibi, we respectfully disagree with his interpretations of these authorities. From the cases, he extracts language to argue his restrictive view of alibi proof, but, as we will explain, none of the cases support his arguments.

In State v. Horenberger, 349 N.W.2d 692, 695-96 (Wis. 1984), the defendant was alleged to have aided two men in planning the robbery of a woman whom the defendant was dating. One of the codefendants, testifying for the state, said that earlier in the day the group, including the defendant, had planned the late night robbery, with the defendant waiting in the car while one of the codefendants robbed the victim and the other burglarized her apartment. When the defendant attempted to present proof that he had been at work during the day and, thus, could not have aided in planning the crime, the State objected that he was attempting to present previously undisclosed alibi proof. The court on appeal concluded that proof the defendant was not present at the planning stage of the crime did not constitute alibi proof, which would focus solely on his whereabouts at the time of the crime itself:

> [T]he notice of alibi statute focuses on the defendant's whereabouts at the time the offense was committed. The statute, by its terms, makes no reference to acts other than the actual offense. In this case, then, the actual offenses to which the statute refers would be the criminal acts which occurred at approximately 11 p.m. The crimes with which the defendant was charged did not occur at the time they were planned. Rather, the crimes occurred at the time the plan was executed by robbing and falsely imprisoning Zess and burglarizing her apartment. The defendant's acts in planning the crimes, which might have led to criminal liability as a party to the crime, were separate in time and location from these offenses. We conclude that the testimony concerning the defendant's whereabouts earlier in the day on July 2 was not an alibi defense within the meaning of [the statute].

Id. at 696.

Thus, in Horenberger, the offered proof was not of alibi because it sought to show only that the defendant was elsewhere when the crime was planned, but not that he could not have been present when it was committed. Accordingly, its holding is irrelevant to the claim in the present appeal that inferential proof of alibi is excused from disclosure.

In another case relied upon by the defendant, State v. Berg, 697 P.2d 1365 (Mont. 1985), Berg admitted that he had arrived at the residence in question at 8:10 p.m. but denied that he there had assaulted the babysitter, as she claimed. Because alibi notice had not been given, the trial court excluded the testimony of a witness who would have testified that he was with the defendant from approximately 7:30 p.m. until 8:10 p.m. that same night. On appeal, the court determined that since this witness would have testified as to being with the defendant earlier in the evening than when the crime was committed, he did not provide an alibi. Accordingly, "the testimony by this witness was not relevant, and it was therefore within the discretion of the court to strike it." Id. at 1367.

The holding in Berg illustrates the dilemma the defendant creates by asserting conflicting claims as to whether the Flowery Branch testimony is evidence of alibi. As explained by 21 Am.Jur.2d Criminal Law § 225, "Requirement That A 'True' Alibi Be Involved" (2002), citing the holding in Berg, "[a] statute or rule requiring that special notice be given to the state of the defendant's intent to present an alibi defense does not apply where the evidence to be offered by the defendant does not relate to a true alibi." In the usual situation, it is the State which argues that the defendant is not presenting a "true" alibi. If the testimony is that a defendant was in another location, but the time and distance were such that he still could have committed the crime, he is not presenting a "true" alibi and, as explained in Berg, the testimony is irrelevant. By contrast, in the present appeal, it is the defendant who is arguing he is not presenting a "true" alibi, as he claims it was not "impossible" for him to have been in "Monterey" and, later that morning, in Flowery Branch. This claim, of course, ignores that the testimony estimated the travel time by automobile to have been, at best, four and one-half to five hours, but frees the defendant to make his corollary argument that since he did not offer a "true" alibi, as the Berg holding would support, he was not required to reveal his witnesses. He then ties together these conflicting arguments, claiming there would have been "a more nearly level playing field" if the jury learned of the defendant's "presence hundreds of miles away from the crime scene within a few hours after the fatal shooting." However, these conjoined arguments ignore the fact, explained in Berg, that if the testimony is not alibi, it, also, is not relevant. Thus, Berg does not support the defendant's argument.

Additionally, the defendant cites, in support of his view of what constitutes "alibi" proof, United States v. Dupuy, 760 F.2d 1492 (9th Cir. 1985), where the prosecution had requested that Dupuy disclose any alibi defense he had for August 31, 1980. However, at trial, the informant testified that the criminal acts occurred on the previous day, August 30, 1980, while the indictment alleged they occurred on yet a third date, September 1, 1980.[7] Id. at 1498. Apparently, Dupuy argued at trial that the prosecution should be allowed to present proof only as to August 31, the date set out in the alibi demand. However, the court, distinguishing a motion for bill of particulars, which would have had the limiting effect sought by the defendant, determined that the differing dates meant that the defendant could present testimony from undisclosed alibi witnesses for August 30, because

---

[7]The court noted that Dupuy's trial counsel had known, from the informant's grand jury testimony, the discrepancies in the dates but waited eighteen days before bringing it to the court's attention in moving for a continuance. As it was, Dupuy presented testimony from his wife and mother-in-law that he was at a party in Nogales, Mexico, on August 30, 1980, until late in the evening.

the prosecution, wrongly believing the offense date was August 31, had sought alibi information only as to the latter date:

> In this case the appellant was not limited by the Rule 12.1 request for notice-of-alibi to alibi witnesses for August 31, 1980. He was free to bring forth any alibi witnesses he deemed appropriate for the other days encompassed by the charges against him. The Government could not, for those days, claim unfair surprise because it had not invoked Rule 12.1 as to those days.

Id. at 1499.

The defendant in the present appeal seeks to use this and other language from Dupuy to argue that, because the State had limited its alibi notice to the period from 6:00 a.m. to 8:45 a.m., Central Daylight Time, on October 19, 1998, he was not required to identify witnesses who would testify as to times outside of this period:

> The State demanded notice as to a specific, discrete, two hour and forty-five minute period. The State made no demand as to any other time. The "alibi" witnesses which the defense thereby became obligated to disclose included those persons (other than the Defendant), and only those persons, that would be offered to establish Byron Looper's whereabouts from 6:00 to 8:45 a.m., Central Standard Time, on October 19, 1998. Here, as in United States v. Dupuy, supra, Mr. Looper was free to bring any witness he deemed appropriate for the other hours of October 19, 1998; as in Dupuy, the Government could not, for those hours claim unfair surprise because it had not invoked Rule 12.1 as to those hours.

We respectfully disagree that Dupuy supplies that which the defendant seeks to extract from it. In fact, the court held that if the prosecution requests alibi information for a discrete period, as alibi notice provisions require, yet proves that the criminal offense occurred during a different period, it cannot seek to exclude alibi testimony as to the second period because the disclosure requirement is only for the period set out in the state's pleading. The Dupuy holding might be relevant to the present appeal if, for instance, the State mistakenly had set out October 20, 1998, in its alibi demand as the date of the crime. The defendant then could argue that the Flowery Branch testimony was not subject to disclosure, since it proved the defendant's whereabouts only on October 19. However, the State did not make this mistake, and Dupuy is not relevant to the defendant's argument.

No authority exists to support the defendant's efforts to explain how the same proof can be alibi for evidentiary purposes but non-alibi for disclosure purposes. If his restrictive version of alibi proof were correct, it then would follow that an accused would not have to reveal, in response to an

alibi demand, the identity of a witness testifying that, fifteen minutes after the period in an alibi demand for a crime occurring in Tennessee, the defendant was camping in the Australian outback. By the arguments in the present appeal, this testimony would not be subject to disclosure, regardless of its implications, because the witness could speak only to the defendant's location outside of the period in the alibi demand. We do not believe that such a result was intended by the drafters of Rule 12.1.

We conclude that, without question, the defendant was attempting to establish an alibi through the testimony of the Flowery Branch witnesses. We now will determine whether the trial court erred in excluding this testimony.

The defendant argues that, in excluding the Flowery Branch witnesses from testifying, the trial court abused its discretion and violated his right to due process of law. Our supreme court explained in State v. James, 81 S.W.3d 751, 760 (Tenn. 2002), the role of the appellate court in reviewing evidentiary rulings of the trial court:

> Rulings on the admissibility of evidence are largely within the sound discretion of the trial court, and on appellate review, a trial court's ruling to admit or exclude evidence will not be disturbed unless it appears that such a ruling amounts to an abuse of that discretion. [State v.]DuBose, 953 S.W.2d [649,] 652 [Tenn. 1997]. . . . "'[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Stevens, 78 S.W.3d 817 (Tenn. 2002) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

The defendant argues that the trial court abused its discretion in excluding the testimony of three of the witnesses from Flowery Branch because the court "inexplicably made no findings with regard to these factors, despite the prosecuting attorney's having cited the same six factors [set out in United States v. Wood, 780 F.2d 555 (6th Cir. 1986)] during argument." He argues, additionally, that we cannot determine whether the trial court abused its discretion in excluding the testimony without considering, also, whether the exclusion violated his right to due process. Relying upon United States v. Hamilton, 128 F.3d 996, 1002 (6th Cir. 1997), the defendant argues that on appeal a *de novo* standard of review is utilized in determining whether a trial court properly considered the factors set out in Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 653-54, 98 L. Ed. 2d 798 (1988).[8] Other courts, however, do not make this distinction, and simply apply an abuse of

---

[8]He asserts also that we should apply the considerations set out in State v. Brown, 29 S.W.3d 427, 431 (Tenn.), cert. denied, 531 U.S. 916, 121 S. Ct. 275, 148 L. Ed. 2d 200 (2000), in deciding whether the trial court violated the defendant's due process rights in excluding the testimony. However, in Brown, the question was whether a defendant's right to due process could require that hearsay testimony be admitted. The violation of a disclosure rule was not an issue

(continued...)

discretion analysis in ascertaining whether a trial court erred in excluding alibi proof. See United States v. Henderson, 241 F.3d 638, 650 (9th Cir. 2000), cert. denied, 532 U.S. 986, 121 S. Ct. 1634, 149 L. Ed. 2d 494 (2001); United States v. Pearson, 159 F.3d 480, 483 (10th Cir. 1998); Lawson v. State, 994 P.2d 943, 946 (Wyo. 2000). We believe that the appropriate standard of review is whether the trial court abused its discretion in excluding the testimony of three of the Flowery Branch witnesses.

Following its previous holding in United States v. White, 583 F.2d 899, 902 (6th Cir. 1978), which, in turn, cited United States v. Myers, 550 F.2d 1036, 1041-42 (5th Cir. 1977), the court, in Wood, set out factors to be considered in determining whether a trial court abused its discretion in excluding undisclosed alibi proof:

> (1) the amount of prejudice that resulted from the failure to disclose, (2) the reason for nondisclosure, (3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events, (4) the weight of the properly admitted evidence supporting the defendant's guilt, and (5) other relevant factors arising out of the case.

780 F.2d at 560-61.

Before the trial court, the State argued that these factors should be considered, as do the State and defendant on appeal. Accordingly, we will utilize them in our review.

### A. Prejudice to the State

The defendant argues that any prejudice to the State was the result of its "own investigative ineptitude," and that the defendant's alibi response, although "incomplete and therefore technically insufficient," nonetheless "placed the prosecution on notice" by denying that the defendant had been at the crime scene on October 19, 1998. Additionally, the defendant notes that state investigators had interviewed two of the witnesses before he had been charged, before there was "any reason to fabricate an alibi."[9] Further, he argues that the State "assiduously avoided asking questions [of these two witnesses] which could have developed exculpatory information." Finally, he asserts that the record does not show that the investigation and prosecution "would have proceeded one whit differently had the existence of the three witnesses . . . been disclosed." The defendant presents neither legal authorities, where appropriate, nor citations to the record in support of these claims.

---

[8](...continued)
and, therefore, Brown is not applicable to the present appeal.

[9]This assertion is true. However, neither the defendant's mother, brother, nor Paul Voelker, revealed to the State, until the presentation of defense proof at trial, that the defendant had been in Flowery Branch the morning of the crime. Thus, before there was any reason to provide an alibi, none of his witnesses revealed that he had been in Flowery Branch the morning of the crime.

We can imagine no reason why the State would not have wanted to know that witnesses would claim the defendant was in Flowery Branch on the day of the crime. Although the defendant argues that the State did not want to develop "exculpatory information" as to his whereabouts, it would not appear necessary that the State discover where the defendant was at the time of the crime so that his location then could be revealed to him. Given the immediate and massive investigation that followed this crime, it would be illogical to conclude that an equal effort would not have been devoted to investigating an alibi disclosed by the defendant.

In fact, the proof developed by the State following the crime would not appear to suggest that the defendant later would claim that he was in Flowery Branch on October 19, 1998. Joe Bond told the prosecutor's office, shortly after the crime, that the defendant had come unannounced to his residence in Hot Springs, Arkansas, the late evening of the crime. Also, according to Michelle Henson and her ex-husband, Douglas Henson, the defendant said only that he was "south" on the day of the crime. Thus, there appears to have been no reason for the State to single out Flowery Branch to determine whether the defendant was there the day of the crime, especially since neither his mother, his brother, nor Paul Voelker told investigators of this alleged fact when questioned shortly after the crime.

To assess the degree of prejudice to the State, we will review the situation of the State as the result of the nondisclosure of the claim that the defendant was at his mother's home in Flowery Branch, Georgia, shortly after the crime.

The homicide occurred on October 19, 1998, and the State filed its alibi notice request on February 17, 1999, four months later. On August 14, 2000, presentation of proof began at the trial in Cumberland County, with a sequestered jury which had been picked in Sullivan County. Substantial barriers would have affected the State's ability to begin investigating, on August 21, 2000, after resting its case in chief on August 17, whether the defendant had been at his mother's house in Flowery Branch, Georgia, on October 19, 1998. Obviously, a trial recess would have been required so that investigators could go to Flowery Branch to investigate the alibi. The investigative trail would have long since gone cold; and the time for the investigation would have been severely compressed, given the fact of the sequestered jury waiting in Cumberland County for the return of the State's investigators. Additionally, because the defendant argued through his attorneys that the Flowery Branch testimony both permitted and prevented his being in Monterey during the period in the alibi demand, the State could have deemed it necessary to investigate travel possibilities between the two locations. Given that the trial in this matter followed a massive investigation occurring in at least three states, and that the State had rested its case four days earlier, it requires some imagination as to how the prosecution could have been maneuvered into a more difficult situation than that achieved by the defense.

Although the defense argued at trial that the State could be given time to interview the alibi witnesses, given the situation, it is difficult to envision what could have been done by the trial court, other than exclude the testimony or allow it. Even under less difficult circumstances for the prosecution, a recess to investigate an undisclosed alibi may not be a reasonable remedy. In United

States v. White, 583 F.2d 899 (6th Cir. 1978), the court determined on appeal that the trial court had not erred in excluding the testimony of an alibi witness who was revealed after both sides had rested, but before the matter had been submitted to the jury.  The court explained why a continuance, to allow the prosecution to investigate the undisclosed alibi witnesses, would have been unreasonable:

> [T]he Government would have been seriously prejudiced if Walker had been permitted to testify because the Government would not have had an opportunity to interview Walker and investigate the veracity of his representations regarding appellant's whereabouts on the date of the robbery.  Because Walker's testimony was not offered until both parties had rested at the close of a three day jury trial, a continuance for this purpose would not have been satisfactory.

Id. at 902.

Likewise in United States v. Hamilton, 128 F.3d 996 (6th Cir. 1997), the court concluded that a continuance, to allow the prosecution to investigate and attempt to rebut certain records which the defendant did not reveal until the trial, was not a reasonable option:

> In the present case, allowing the surprise admission of the receipts would have delayed the trial, and worse.  The prosecution would have been entitled to a continuance to conduct an investigation and to call additional witnesses.  As the court in Tyson v. Trigg, 50 F.3d 436, 446 (7th Cir. 1995), cert. denied, 516 U.S. 1041, 116 S. Ct. 697, 133 L. Ed. 2d 655 (1996), pointed out, "Delay in a jury trial is a serious matter . . . and the prosecution's ability to rebut the surprise [evidence] effectively [is usually] less than its ability . . . during the case in chief."  In the present case, the district court was faced with either having to continue the trial, which was in its sixth day, in a case that was over two years old, or to sanction defendant for his actions by precluding defendant from introducing the receipts.  The court's alternative choice of a continuance would have disrupted the trial schedule and harmed the government, which had presented, in its case-in-chief, a wealth of evidence through many witnesses involving complicated financial dealings.

Id. at 1004.

In the present appeal, the prosecution would have been pushed into a position as least as difficult as would have resulted in Hamilton, had the defendant there been permitted to use the late revealed receipts.  Here, the pressures of time, both because of the nearly two years since the crime, and the waiting, sequestered jury, would have dampened substantially the ability of the State to

investigate the alibi. We conclude that the prejudice to the State would have been very great had the three excluded witnesses been allowed to present an alibi for the defendant.

## B. Prejudice to the Defense

The defendant argues that "[t]he prejudice to the Defendant from the exclusion of the proffered witnesses is monumental." However, this assertion is true only because the proof established an alibi for the defendant, which, as we have stated, he denies for purposes of ascertaining his disclosure responsibility yet relies upon to establish prejudice.

The true prejudice to the defense is somewhat difficult to assess because the State had to cross-examine, without advance notice, witnesses claiming that the defendant was in Flowery Branch, Georgia, the morning of the crime. Even with no preparation by the State, however, obvious questions were apparent as to the veracity of the alibi witnesses. Neither the defendant's mother nor his brother told investigators that he had been in Georgia at the time of the crime and may not have revealed the alibi even to the various lawyers representing him until shortly before the trial began. His brother, although attending the preliminary hearing, said that, while there was testimony about the shooting, "there was no time frame established with when that had taken place." However, a transcript of the preliminary hearing shows that Dr. Sullivan Smith, a staff physician at the Cookeville General Emergency Department, testified that he arrived at the scene at 9:30 a.m. on October 19 and examined the victim's body, which was still in the truck. Additionally, Joe Bond testified at the preliminary hearing, much as he did at the trial, that the night the shooting of the victim had "hit the press," the defendant came to his residence in Hot Springs, Arkansas, saying that he had "killed that dude," that he had "busted a cap in his head," explaining that he had killed "[t]hat guy [he] was running against." Given this testimony, a reasonable jury might have been skeptical of Russell Looper's claim that, although attending the preliminary hearing, he had not understood the significance of the defendant's being in Georgia at 11:00 a.m. the day of the killing, as well as his explanation for not earlier revealing that his brother, who had remained in jail for nearly two years while awaiting trial, actually had been in Flowery Branch shortly after the crime.

In assessing prejudice to the defendant, we note that the trial court, over the objection of the State, permitted his mother to testify, circumstantially, that he had used his bed in her home on October 18-19 and had showered there on October 19, 1998, between approximately 6:00 a.m. when she left for work and about 5:00 p.m. when she arrived back at her home. Since this testimony, in theory, would have allowed the defendant both to have committed the crime in Monterey and then driven to her home in Flowery Branch to shower, use his bed, and depart, before his mother arrived home from work, her testimony was not a "true" alibi, as the defense argued but, as they do not acknowledge, could have been excluded by the trial court as irrelevant.

The value of the testimony of Barbara Reed and Paul Voelker is somewhat more difficult to assess. Both explained their abilities to remember occurrences on a day nearly two years earlier by keying the day to specific events. Reed said that she had been to a birthday party the day before the crime and was looking for a rental house when she observed the defendant in the front yard of his

mother's house. Voelker said that he remembered the day because of his work schedule and events at work. Reed said that she had told the defendant's mother in June 1999 of having seen the defendant in Flowery Branch on the day of the crime, and Voelker said he had done so in July 2000. Since the State was not able to investigate the claims of either of these witnesses, or their backgrounds including their criminal records, if any, as well as their relationship with the Loopers, it is difficult to assess fairly the evidentiary value of their testimony. Jurors might have been skeptical of their ability to remember, with such seeming precision, events of two years earlier. Of course, the evidentiary impact of these witnesses would have been boosted by the fact that, had they been allowed to testify, the State would have been required to cross-examine them with little time for preparation or knowledge of their backgrounds.

## C. Reason for Nondisclosure

We note that between the time of the State's filing its alibi demand and the trial, the defendant was represented by at least five attorneys, with numbers four and five representing him at the trial. Neither the record on appeal, nor the defendant's attorneys at trial, explained why the previous three attorneys representing him had not supplied the State with the names of at least some of the alibi witnesses presented at the trial, whether they had been told that the defendant, supposedly, was in Flowery Branch the day of the crime, or whether they, also, concluded that this was not "alibi" proof. Although Russell Looper said that he had spoken with one of the defendant's previous counsel about the alibi, he could not recall with whom he had spoken or when the conversation took place.

The attorneys representing the defendant at trial came into the case only in June 2000. Apparently, they learned of Barbara Reed in July 2000, the month before the trial began, but the record does not reflect when they learned of the other alibi witnesses. Obviously, the defendant's trial counsel decided that they would not disclose the alibi witnesses to the prosecution. The defendant argues on appeal that "[i]t is evident from any fair reading of the record that trial counsel firmly believed that Ms. Reed, Mr. Voelker and Mr. Russell Looper were not alibi witnesses in the first place." That may be. However, we note that during the lengthy arguments to the trial court as to whether Flowery Branch witnesses would establish an alibi, the defendant's trial counsel never explained their basis for believing that an exception to the alibi notice requirement excused them from having to reveal the identities of these witnesses. They cited no legal authorities supporting such a restrictive view of "alibi," except to argue that the prosecution was "misreading" cases which the State cited to the court.

We note that, under circumstances similar to these where the defendant, himself, had known of the identities of at least some of his alibi witnesses since he was charged, he has been held responsible for the late or nondisclosure even to his attorney of his alibi witnesses. In United States v. Pearson, 159 F.3d 480 (10th Cir. 1998), the court considered the claim that the trial court had erred in excluding alibi testimony from the defendant's mother, after she and the defendant had not revealed, until four days before the trial was to begin, that the defendant was with her the night of the robbery-murder for which he had been charged:

Defense counsel "became aware that an alibi defense may exist" on June 12 because that is the first date Mr. Pearson or his mother bothered to tell counsel of her alibi testimony--that she had seen her son standing in her kitchen at the exact time and on the exact date of the robbery and killing--despite its obvious importance. Nor had Mr. Pearson's mother exculpated her son on the several occasions when she was questioned by the government during its investigation. As the very nature of Mr. Pearson's alleged alibi confirms that he and his mother would have known of it long before the deadline for submitting his alibi defense, he cannot show good cause, as required by Fed. R. Crim. P. 12.1(e), for failure to comply with Rule 12.1(a). The district court did not abuse its discretion in excluding Mr. Pearson's alibi testimony.

Id. at 484 (footnote omitted).

In the present appeal, the prosecution was placed into an even more difficult position than that which occurred in Pearson, for here the jury was sequestered and the State had rested its case in chief before learning that four alibi witnesses would place the defendant in another state at the time of the crime. Thus, the challenge to investigate this alibi would have been substantially greater than was the case in Pearson.

## D. Weight of the Evidence

The strength of the State's case is another consideration in whether the trial court erred in excluding testimony of the alibi witnesses from Flowery Branch. Contrary to the defendant's view, we believe the evidence to have been strong. Before the murder, the defendant told Joe Bond of his intention to kill the victim and, then, confessed to Bond the evening of the crime. Wesley Rex identified the defendant as the person at the crime scene with the victim just before the shooting. The tire tracks made by the Audi, which the defendant had purchased just before and abandoned shortly after the crime, were consistent with the tire tracks left at the scene. The pistol used for the shooting was in the possession of John Bowden, a friend and employee of the defendant, shortly before the shooting. Jenny Conley identified the defendant as her first customer at the Hardee's restaurant in Monterey on October 19, 1998, saying that he was driving a black, four-door car. The defendant abandoned a black, four-door Audi 4000 at the auto repair shop of Gerhard Noll in Tucker, Georgia. William Lindsay Adams, responding to an advertisement for assistance in a political campaign, telephoned the defendant, who said, in response to a question about the political race, that it would cost "[t]hirty-five cents," and that "if a candidate wasn't in the race at the end, if something happened to the candidate, that the race wouldn't cost that much to run." From all of this, we conclude that the proof against the defendant was strong.

## E. Exclusion of Alibi Proof

The defendant argues on appeal that, if the excluded proof was of alibi, as we have concluded was the case, the trial court abused its discretion by not allowing the testimony and, further, that his right to due process was violated by the trial court's excluding the testimony of these three witnesses, explaining this argument in his brief:

> None of the governmental interests mentioned in the Taylor balancing test is substantial enough to outweigh the Defendant's right to compulsory process and his right to present witnesses in his favor. The integrity of the adversary process would have been enhanced by admission of the proffered testimony. Proof that the accused was not present when the decedent was killed, if believed, would mandate an acquittal. Where the proof against the accused is wholly circumstantial, it is important that the question of the accused's presence *vel non* at the scene of the offense should be fairly left to the jury.

Others, however, have taken a more skeptical view of alibi proof, especially that kept hidden until the eleventh hour, as explained in the much quoted language: "[A]libi is a 'hip pocket' defense, easily prepared for introduction in the final hours of trial and therefore more likely to catch the prosecutor by surprise." McKoy v. United States, 518 A.2d 1013, 1018, n.10 (D.C. Ct. App. 1986) (citing LaFave & Israel, Criminal Procedure § 19.4(b), at 743 (1982)). Likewise, in State v. Edwards, 368 N.E.2d 302, 304 (Ohio 1975), the court explained the rationale for the alibi notice requirement: "Records are replete with alibi testimony from relatives, girlfriends and bar companions and, as to these, the rule pertaining to prompt notice is based on sound reasoning."

The defendant argues that, "[a]s for indicia of reliability, the proferred witnesses are of course presumed to be truthful," citing Hull v. State, 553 S.W.2d 90, 93 (Tenn. Crim. App. 1977). As part of this argument, the defendant also asserts as follows:

> Two of the witnesses had been interviewed by law enforcement agents before the Defendant was charged, such that the need for alibi testimony had not yet arisen. The State, despite having an opportunity for unlimited cross-examination on the proffers and the opportunity to proffer rebuttal evidence thereto, adduced no reason to disbelieve any of the proferred witnesses. Two of the proffered witnesses had not [sic] interest in the outcome, and there is no evidence that Russell Looper's familial relation to the Defendant would have caused him to lie under oath.

We disagree with the presumption of truthfulness claims attached by the defendant to the Flowery Branch witnesses. In fact, the State's "opportunity" to question the unrevealed alibi

witnesses consisted of engaging in a "cold" cross-examination, without advance preparation. Additionally, any rebuttal evidence was several hundred miles away, in another state, its availability dimmed with the nearly two-year passage of time since the crime. The defendant asserts, also, that the State's cross-examination "adduced no reason to disbelieve any of the proferred witnesses," that two had no interest in the outcome, and there was no showing that Russell Looper's "familial relation to the Defendant would have caused him to lie under oath." These arguments, however, beg the question. Having forced the State into a position of being unprepared to cross-examine the alibi witnesses or present rebuttal proof because of his ignoring Rule 12.1, the defendant cannot now legitimate this tactic by the fact that, in his view, the State was unsuccessful in its cross-examination and failed to present alibi rebuttal proof. In fact, the jury was instructed as to how to assess the credibility of witnesses:

> In forming your opinion as to the credibility of a witness, you may look to the proof, if any, of his general character, the evidence, if any, of the witness' reputation for truth and veracity, the intelligence and respectability of the witness, his interest or lack of interest in the outcome of the trial, his feelings, his apparent fairness or bias, his means of knowledge, the reasonableness of his statements, his appearance and demeanor while testifying, his contradictory statements as to material matters, if any are shown, and all the evidence in the case tending to corroborate or contradict him.

Since the alibi witnesses were presented without advance notice, the State would have been unprepared to cross-examine the witnesses in these areas. While we cannot foresee what the State might have developed for cross-examination or rebuttal purposes, had they had the opportunity to investigate the alibi witnesses, it is clear that they were denied the right to do so, and the jury, in turn, was denied information which would have assisted in determining the credibility of these witnesses.

We now will review the defendant's claims that the trial court erred in excluding the testimony of three of the Flowery Branch witnesses.

The United States Supreme Court explained in Taylor v. Illinois, 484 U.S. 400, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988), the matters which the trial court must consider in determining whether countervailing public interests outweigh the defendant's right to present a defense:

> It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of

> justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

Id. at 414-15, 108 S. Ct. at 656 (footnote omitted).

The defendant presents a number of arguments as to why the trial court erred in excluding the testimony of his alibi witnesses. As we will explain, we find none of these arguments to be persuasive, for all ignore the purpose for the alibi notice statutes. Additionally, while the authorities cited by the defendant provide general legal principles which superficially support his claims, the factual situations in those cases, resulting in the appellate courts' affirming exclusion of late revealed alibi witnesses, do not support his argument that the trial court erred in excluding the testimony of the three Flowery Branch witnesses.

In United States v. Hamilton, 128 F.3d 996, 999 (6th Cir. 1997), cited by the defendant for the proposition that the appellate court reviews trial court evidentiary rulings involving Sixth Amendment claims using a *de novo*, rather than abuse of discretion, standard, the defendant was charged with failing to include in his gross income, set out in his tax returns, the proceeds of sales of certain coal. On the sixth day of the trial, after the government had rested its case in chief, the defendant announced that he intended to present as exhibits cash receipts, totaling $240,000 to show that he had used receipts from the sale of coal to purchase coal. The trial court barred this evidence, and, following its *de novo* review, the appellate court determined that the receipts were excludable because the circumstances under which they appeared indicated the defendant was trying to gain an advantage by not revealing them until the last possible moment:

> [T]his is a case, like Taylor, in which defendant could have satisfied the applicable discovery rules with ease. This was not a situation where the defense had no way of knowing of the existence of the receipts or their necessity in corroborating defendant's alibi. Nor was it a situation where the rules in question were abstruse or onerous. The directives of the district court's discovery order were explicit. We find that even if the receipts were not fabricated, failure to make any mention of them for two years until after the prosecution had rested its case-in-chief, and then springing them on the prosecution, unawares, indicates an attempt to unfairly gain a tactical advantage at trial. In Michigan v. Lucas, 500 U.S. 145, 111 S. Ct. 1743, 114 L. Ed. 2d 205 (1991), the Supreme Court reiterated its holding in Taylor and stated that when a discovery violation amounts to willful misconduct and is designed to obtain a tactical advantage, regardless of whether prejudice to the prosecution could have been avoided by a lesser penalty, the severest sanction is appropriate. Id. at 152, 111 S. Ct. at 1747-48.

Hamilton, 128 F.3d at 1004.

Additionally, the court found on appeal that the sudden appearance of the receipts was "prejudicial to the government's litigation stance:"

> As the Supreme Court has stated, the "'State's interest in protecting itself against an eleventh hour defense,' is . . . one component of the broader public interest in a full and truthful disclosure of critical facts." Taylor, 484 U.S. at 412, 108 S. Ct. at 654, citing Williams v. Florida, 399 U.S. 78, 81-82, 90 S. Ct. 1893, 1895-96, 26 L. Ed. 2d 446 (1970). We believe that in the present case these efficiency and fairness concerns, in combination with the other factors discussed, outweigh defendant's right to compulsory process.

Id. Thus, in Hamilton, upon *de novo* review, the appellate court found that the defendant had held back the receipts in order to gain a tactical advantage.

Noting that Chappee v. Vose, 843 F.2d 25, 31 (lst Cir. 1988), stated that "[e]xclusionary sanctions must appropriately be reserved for hard-core transgressions," the defendant argues:

> In light of trial counsel's earnest contention that the testimony of the proferred witnesses was never within the scope of what Tenn. R. Crim. P. 12.1 requires to be disclosed, there is nothing willful nor defiant about any insufficiency of the notice of alibi. To characterize this as even approaching the gravity of a "hard-core transgression" would be beyond the pale.

However, while the defendant may seek assistance from this language in Chappee, its example of a "hard-core transgression" does not advance his argument that the present appeal does not present a violation of equal magnitude. In Chappee, the appellate court overruled the trial court in a federal habeas corpus appeal, concluding on appeal that the state trial judge's preclusion of three defense expert witnesses was appropriate. This issue arose when, in the drug prosecution of the defendant, the defense attorney asked, as the testimony of the state's chemist was nearing an end, that the defendant be allowed to present three expert witnesses "who came from distant points outside New England [and] were ensconced in the back of the courtroom." Id. at 27. These witnesses had not been disclosed earlier in spite of a state requirement for reciprocal discovery in criminal cases. Concluding that the defense had withheld the names of the witnesses to gain an advantage, the state trial court excluded their testimony. On appeal, the First Circuit, likewise, concluded that the defense experts had not been revealed because the defendant sought a tactical advantage:

> In this matter, as in Taylor, the "truth-determining function" of the trial process was grievously at risk. Although Chappee argues that Taylor, unlike himself, desired to present testimony of dubious provenance, the distinction is not a critical one. Telling the truth

seems a simple exercise. Yet determining the truth is a complicated business, and its achievement can be thwarted as easily by "springing" surprise testimony on an unsuspecting opponent – especially surprise testimony of a highly technical nature – as by presenting perjured testimony. Cf. Taylor v. Illinois, 108 S. Ct. at 654 (pretrial discovery "minimizes the risk that a judgment will be predicated on incomplete [or] misleading . . . testimony"); id. at 655 (court may reasonably "presume that there is something suspect about a defense witness who is not identified until after the eleventh hour has passed"). Here, perhaps more evidently than in Taylor, concealing the witnesses' identities could only be thought "motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence." Id.

Chappee, 843 F.2d at 31.

The court in Chappee further determined that a continuance to allow the prosecution to prepare to rebut the testimony of the three defense experts was not a reasonable option:

To be sure, petitioner argues that the prejudice which inhered to the prosecution could have been minimized to some extent by jockeying the trial schedule – say, by granting a lengthy continuance, permitting the prosecution to enlist new experts of its own, declaring a mistrial, or the like. Yet we will not engage in such Monday morning quarterbacking. A defendant who elects willfully to subvert the rules is in a peculiarly awkward position to insist that the trial court must engage in extravagant contortions to attempt to extricate him from a self-dug hole.

Id. at 32.

A similar result was reached in Tyson v. Trigg, 50 F.3d 436 (7th Cir. 1995), also an appeal of a federal habeas corpus matter, wherein the defendant had been convicted in an Indiana state court of rape. Soon before the trial began, the defense had been ordered to identify the witnesses who would testify on the issue of consent. After three days of jury selection, beginning on a Monday, and one day of the state's presenting its proof, the defense learned of three women who claimed to have relevant information; and, on Friday night, one of the defense attorneys met with them. The women claimed to have seen the defendant and the victim kissing in the back of a limousine and holding hands the night of the rape. The defense attorneys obtained a court order on Saturday, which also was a trial day, to inspect the vehicle and determine if the witnesses could have seen this activity through its tinted windows. Ascertaining that this could be done, they telephoned the prosecutor on Sunday, identifying the witnesses and providing a summary of their expected testimony.

The following day, the parties presented arguments as to whether the three witnesses should be allowed to testify. Although not concluding that the defense had deliberately violated the continuing order to identify witnesses, the trial court ruled, nonetheless, that because the witnesses had not been identified on Saturday, the day after the defense had met with them, the witnesses would not be allowed to testify.

On appeal, the court recognized that, although the disclosure violation was not willful, it caused substantial problems for the prosecution and, thus, preclusion of their testimony was the appropriate remedy:

> We must distinguish between sanctions as punishment designed to prevent future violations of similar orders, and sanctions as means of achieving the specific objective of the specific order. Allowing the surprise witnesses to testify would have delayed the trial, and worse. As Tyson concedes, the prosecution would have been entitled to call additional rebuttal witnesses in an effort to offset the impact on the jury of the three new witnesses; or to be granted a continuance to conduct an additional investigation, for example to determine whether it was possible to see into the limousine's interior at night. Delay in a jury trial is a serious matter, especially when, as in this case, the jury is sequestered. The prosecution's ability to rebut the surprise witnesses effectively would, moreover, have been less than its ability to have pulled their fangs by adroit questioning of W__ and other prosecution witnesses during the case in chief. W__ could have been asked how dark it was and whether there were people standing on the sidewalk when she and Tyson walked into the hotel together and how close their hands were--might an onlooker have *thought* they were holding hands? She could have testified to this on rebuttal, too, had the witnesses been allowed into the case. But to have recalled her to the stand on rebuttal for the express purpose of replying to the surprise witnesses would have magnified the impact of their testimony; would have made it seem that the prosecution had been--surprised. Which it would have been. The purpose of the discovery order was to prevent surprise; and the purpose of excluding evidence whose introduction would have violated the order was not merely to punish violators but also to achieve the objective of the order by keeping surprise out of the case.

Id. at 445-46.

In Watley v. Williams, 218 F.3d 1156 (10th Cir. 2000), cert. denied, 531 U.S. 1089, 121 S. Ct. 809, 148 L. Ed. 2d 695 (2001), the appeal of a federal habeas corpus claim, the court concluded that the New Mexico state court had not violated the petitioner's due process rights in excluding the

testimony of a witness who had not revealed, until a meeting with the defense attorney and prosecutor following the eleventh day of trial, that he had seen the defendant at a party after the rape had occurred:[10]

> Unlike the attorney in <u>Taylor</u>, Petitioner's counsel did not willfully hide Baca's testimony from the State. <u>See</u> <u>Watley [v. State]</u>, 788 P.2d [375,] 376-77 [(N.M. Ct. App. 1989)]. Nevertheless, Petitioner's counsel violated New Mexico's alibi witness rule by not listing Baca as an alibi witness. <u>See</u> <u>id.</u> at 377. Because preparing a rebuttal to Baca's testimony would require a continuance to re-interview ten to fifteen witnesses, the New Mexico Court of Appeals reasonably concluded that allowing Baca to testify about Petitioner's whereabouts would have prejudiced the State. <u>Id.</u> Also, because of its late discovery, Baca's testimony calls into question the integrity of the judicial process. <u>See</u> <u>id.</u> at 377-78.

<u>Id.</u> at 1159.

Likewise, the court in <u>State v. Maestas</u>, 815 P.2d 1319 (Utah Ct. App. 1991), concluded that the trial court did not violate the defendant's right to due process by not allowing his girlfriend, who had not been disclosed as an alibi witness, to testify what time he allegedly had left her house the day of the burglary:

> Defendant had the opportunity to present alibi testimony. All he needed to do was comply with the timing requirements of [Utah Code Annotated] section 77-14-2. The witness, whose testimony was excluded in this case, did not suddenly materialize during the trial. She was known to defendant from the outset of the case. Defendant has not shown any good cause why the requirement of notice should be waived. Since he did not provide notice of his alibi witness, he did not comply with section 77-14-2, and the trial court properly excluded the alibi witness's testimony.

<u>Id.</u> at 1325 (footnote omitted).

In <u>People v. Walker</u>, 743 N.Y.S.2d 403, 404 (N.Y. App. Div. 2002), the court determined that the trial court did not abuse its discretion or violate the defendant's due process rights by excluding the testimony of his alibi witness:

---

[10]The court on appeal determined that, since the parties treated this testimony as providing an alibi, it likewise would do so, although it did not preclude the defendant's having "left the party, raped the victim, and returned to the party before sunrise," and then being seen by the excluded witness. <u>Watley</u>, 218 F.3d at 1157 n.1.

Here, defendant could have provided timely alibi notice long before the close of the People's case since he would have known from the time of his arrest whether he was with anyone at the time he was accused of making a series of drug sales. Accordingly, it is immaterial when substitute defense counsel learned of the witness's whereabouts. The emergence of the alibi witness at the eleventh hour indicated that her proposed testimony was a product of recent fabrication . . . and warrants a finding of willful conduct on the part of defendant, personally.

The defendant in State v. Jamison, 552 N.E.2d 180 (Ohio 1990), had been tried for the robbery-murder of a bar owner and sentenced to death. An accomplice testified as a state's witness that he and the defendant had been playing basketball at noon on the day of the crime, and the defendant suggested that they rob the bar. They then did so, with the accomplice acting as the lookout and the defendant robbing the bar owner. The defense attorney had refused to provide a list of his witnesses and said that he would not be relying on an alibi. However, the first defense witness was the defendant's girlfriend, who said that she had been with the defendant until at least 2:00 p.m. The state then objected to the defendant's presenting any additional alibi testimony; but, counsel denied that he was doing so, saying he only was refuting the testimony that the defendant had been playing basketball with the accomplice shortly before the crime was committed. The following day, defense counsel advised the court that the defendant's brother and the brother's girlfriend also would testify that the defendant had been at his own girlfriend's house the afternoon of the crime, continuing to assert, however, that he was not presenting alibi proof. He explained that he had not given notice of these witnesses "because the testimony was vague." Id. at 186.

On appeal, the court analyzed the defendant's reasons for wanting to deny that he was presenting alibi evidence:

In this case, appellant's decision not to give alibi notice was a clear tactical decision. Defense counsel wanted the benefit of alibi evidence, that is, to create a doubt, without the burdens of giving notice by supplying witnesses' names and an alibi instruction. Counsel, in fact, largely succeeded. Duncan testified she had been with appellant all day until at least 2:00 p.m. Her brother and his girlfriend corroborated her testimony at least to 1:30 p.m. That testimony was inconsistent with the other facts, a robbery between 1:30 and 2:00 p.m. It conflicted with the testimony of Howell who said he had played basketball with appellant, until noon on the day in question.

Id. at 187.

To conclude our consideration of this issue, we will trace the manner in which evidence of alibi was sought by the prosecution and later presented at trial. The State filed its alibi demand on February 17, 1999; and on March 8, 1999, the defendant asked that he have until June 23, 1999, to respond, because "[s]ince the Defendant has been incarcerated, it makes it difficult to fully comply with the notice as to exact times and witnesses who are available." The State opposed this request and alleged that the defense was attempting to obtain "false testimony." On March 19, 1999, denying this allegation, the defendant again asked for an extension to time to file his alibi response, explaining that the defendant was having a difficult time investigating his alibi because he had "very limited resources," because he was incarcerated, and explaining that "[t]he only time a person would remember exactly where they were is if they were committing a crime. When someone is at a place different than where a crime was committed, it takes some time to investigate witnesses who can recall having knowledge of the Defendant's presence at some place other than the scene of the crime." The attorney who filed this response was replaced by two other attorneys who, themselves, were replaced by counsel who represented the defendant at the trial. This changing of counsel was recounted by the trial court in the order denying the motion for new trial:

> Mr. Looper has been represented by five different attorneys during this Court's effort to get this case tried. These five attorneys are in addition to different attorneys that represented him in the General Sessions Court. Every time the case appeared to be nearing a trial, Mr. Looper would become dissatisfied with his attorneys and would seek to replace them. In one instance the attorney found it necessary to withdraw from representation of Mr. Looper because of ethical reasons. After that withdrawal this Court appointed experienced trial attorneys to try the case. Those attorneys worked diligently in the preparation of the case and identified numerous experts and made a thorough investigation. As the trial date neared, Mr. Looper refused to cooperate with those attorneys and ultimately hired his current attorneys insisting that Mr. Poston and Mr. Cordova were attorneys with which he could cooperate. The Court allowed the dismissal of the appointed attorneys and permitted their replacement by the current retained attorneys three months prior to the trial of this case in August of 2000, at Mr. Looper's insistence.

The attorneys who represented the defendant at trial came into the case only in June 2000, about two months before the August 11, 2000, trial date. Even if they had filed an alibi response in July, when they apparently learned of it, such a response would have been long past the time when the response was required. It might be expected that the State would not have reacted charitably if presented shortly before the trial with an alibi claim, and would have been skeptical both of its timing and veracity. However, trial counsel did not reveal the alibi as soon as they learned of it, nor during the State's case in chief, nor even at the beginning of the weekend of August 18, 2000, as they were presenting the defense proof. Instead, the defense did not call Reba Looper to testify until

Monday, August 21. Thus, the alibi was not revealed until the most difficult time for the State, the beginning of a week during the defense proof, and before a sequestered jury from another county.

Although it is argued on appeal that trial counsel's contention was "earnest" that the defense was not presenting alibi proof and that "there [was] nothing willful or defiant about any insufficiency of the notice of alibi," the record and chronology compel the opposite conclusion. First, as we have discussed at length, the defendant, relying upon what apparently was a self-created and *ad hoc* exception to the alibi notice requirement, argued that the proof was not of alibi and, thus, not required to be disclosed while, at the same time, arguing the proof showed it was "impossible" for him to have committed the crime. As a corollary to his non-alibi claim, and making his arguments even more contradictory, he contended also that the Flowery Branch testimony would have permitted him both to have been in "Monterey" around the time of the crime and in Flowery Branch three hours later. We note that the defendant's alibi response stated that he had not been at the victim's farm during the period in the alibi demand. Not knowing whether counsel was using interchangeably "farm" and "Monterey," it is unclear whether defense trial counsel intentionally was contradicting the written assertion of previous counsel.

While the defendant argues that witness exclusion is limited to "hard-core transgression[s]" and to so characterize this matter "would be beyond the pale," we respectfully disagree. We note that the defendant has not provided examples of such transgressions so that we may compare what he concedes is "hard-core" with that which he claims here is not. In fact, from an exclusion standpoint, the facts of cases discussed in this opinion, where on appeal it was determined that the trial court had not erred in excluding the testimony of late-revealed witnesses, are scarcely distinguishable from those of the present appeal. The existence of a large and gaping exception to the alibi notice requirement, the existence of which the defense claims to "firmly believe[]," ignores the very purpose of disclosure, as explained by Taylor:

> "Notice-of-alibi rules, now in use in a large and growing number of States, are based on the proposition that the ends of justice will best be served by a system of liberal discovery which gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial. . . . The growth of such discovery devices is a salutary development which, by increasing the evidence available to both parties, enhances the fairness of the adversary system."

484 U.S. at 411, 108 S. Ct. at 654 n.16 (quoting Wardius v. Oregon, 412 U.S. 470, 473-474, 93 S. Ct. 2208, 2211, 37 L. Ed. 2d 82 (1973)).

In arguing for recognition of his exception to the alibi notice requirement, the defendant does not suggest how, given that the interest of justice requires that reliable evidence be presented and unreliable evidence rejected, the judicial process is advanced by excluding from disclosure testimony which goes to the defendant's whereabouts just outside the period in the alibi demand, while

-61-

testimony as to his location within the period must be disclosed. Both categories of testimony would appear to be equally subject to manipulation. However, an obvious beneficiary of such an exception would be the defendant in the present appeal. Applicable here is the much quoted language from Williams v. Florida, "[t]he adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played." 399 U.S. at 81, 90 S. Ct. at 1896.

To conclude our analysis of this issue, we consider again the language of Taylor, explaining the reasons for limiting a defendant's Sixth Amendment rights:

> The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case. The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony. Neither may insist on the right to interrupt the opposing party's case, and obviously there is no absolute right to interrupt the deliberations of the jury to present newly discovered evidence. The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.

484 U.S. at 410-11, 108 S. Ct. at 654 (footnote omitted).

We conclude that the manner in which the defense sprung the alibi witnesses evinces an effort to gain a tactical advantage, the circumstances and timing effectively inoculating them from a complete or thorough cross-examination. Further, we conclude that the administration of justice and the adversary process would have suffered had the trial court not excluded the testimony of these witnesses. Accordingly, the trial court did not abuse its discretion in not permitting the witnesses to testify before the jury.

## II. *In Camera* **Inspection of Psychological Records**

On appeal, the defendant asks that this court review the psychological records of State's witness Wesley Rex. The trial court reviewed these records and denied production to the defendant, explaining the rationale in the order overruling the motion for new trial:

> Mr. Wesley LeRoy Rex is described as a mentally retarded person but he has never been hospitalized in any mental health facility in the

[S]tate of Tennessee. Mr. Rex underwent psychological evaluations and testing as a part of the evaluation process to determine whether or not he qualified for educational services under the Individuals with Disabilities Education Act. These psychological records were subpoenaed by Mr. Looper's former attorney, Douglas Trant. The school system intervened and responded to the motion asserting that these records were privileged under both federal and state law. Mr. Rex also asserted his privilege as to his psychological assessment. This Court held a pretrial hearing on this issue months before the trial and overruled the objection of Mr. Rex and the school board, ordering the records to be produced for an in camera inspection by the Court. The purpose of the Court's inspection was to determine if there was evidence in the record that would be useful to aid the Court and the jury in appraising the credibility of Mr. Rex as a witness and in assessing the probative value of his direct testimony. Mr. Rex freely admitted in his testimony his special education background and his limited ability to read, write, and perform math functions. The Court's review of the school records failed to demonstrate psychological evidence that would touch on either Mr. Rex's ability to perceive and remember or his credibility as a witness as required by State v. Barnes, 703 S.W.2d 611 (Tenn. 1985), State v. Middlebrook, 840 S.W.2d 317 (Tenn[.] 1992), State v. Suttles, 30 S.W.3d 252 (Tenn. 2000). Therefore, this assignment of error is overruled.

We have reviewed the records pertaining to Wesley Rex which are under seal and conclude, as did the trial court, that, given the evidence presented during the trial as to the limitations of Mr. Rex's abilities, the records fail "to demonstrate psychological evidence that would touch on either Mr. Rex's ability to perceive and remember or his credibility as a witness."

### III. Sufficiency of the Evidence as to Aggravating Factor

The defendant argues that the evidence was insufficient for the application of Tennessee Code Annotated section 39-13-204(i)(11):

(i) No death penalty or sentence of imprisonment for life without possibility of parole shall be imposed but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which are limited to the following:

(11) The murder was committed against a national, state, or local popularly elected official, due to or because of the official's lawful

duties or status, and the defendant knew that the victim was such an official[.]

The defendant's specific claim as to the insufficiency of proof to support application of this aggravating factor is explained in his brief:

> Here the decedent was an elected State Senator, and the Defendant does not dispute that he knew what elective office the decedent held. The evidence is insufficient, however, for a rational trier of fact to conclude that Senator Burks was murdered "due to or because of the official's lawful duties or status." The evidence at trial taken in the light most favorable to the State, shows at most that Mr. Burks was killed not because of his official duties or status, but instead because he was a candidate for office.

The fact is that the victim was both the incumbent state senator for the district and a candidate for reelection, and his death would create a vacancy for this office. The record fully supports the determination of the jury that the defendant killed the victim to create a vacancy in the position for which the defendant was a candidate.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the conviction and the imposition of life without the possibility of parole.

_____
ALAN E. GLENN, JUDGE